Arthur **BARY**, also known as Achilles Diamantis Daramparis; Anna Bary; Harold Zepelin, also known as Harry Zepelinsky; Lewis Martin Johnson; Joseph William Scherrer; Maia Scherrer, also known as Maia Turchin; Patricia Julia Blau, Appellants,

v.

**UNITED STATES of America,** Appellee.

**Nos. 5240–5246**

United States Court of Appeals Tenth Circuit.

Aug. 23, 1957.

William A. Bryans, III and Forrest C. O'Dell, Denver, Colo., and Mary M. Kaufman, New York City (Bryant O'Donnell and Harry A. Frumess, Denver, Colo., on the brief), for appellants.

Thomas J. Mitchell, Sp. Asst. to Atty. Gen. of U. S., Philip T. White, Atty., Department of Justice, Washington, D. C., and Donald E. Kelley, U. S. Atty., Denver, Colo., for appellee.

Before BRATTON, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.

BRATTON, Chief Judge.

This was a prosecution for an alleged conspiracy to violate section 2 of the so-called Smith Act, 54 Stat. 670, 671. The offense laid in the indictment was that from on or about April 1, 1945, to and including the date of the return of the indictment, in the District of Colorado, and elsewhere, Arthur Bary, also known as Achilles Diamantis Daramparis, also known as Arthur Daramparis; Anna Bary; Harold Zepelin, also known as Harry Zepelinsky; Lewis Martin Johnson; Joseph William Scherrer; Maia Scherrer, also known as Maia Turchin; and Patricia Julia Blau; unlawfully, wilfully, and knowingly conspired with each other and with William Z. Foster, Eugene Dennis, John B. Williamson, Jacob Stachel, Robert G. Thompson, Benjamin J. Davis, Jr., Henry Winston, John Gates, Irvin Potash, Gilbert Green, Carl Winter, Gus Hall, and Elizabeth Gurley Flynn, co-conspirators but not defendants herein, and with divers other persons to the grand jury unknown, to commit offenses against the United States prohibited by section 2 of the Smith Act, 54 Stat. 671, 18 U.S.C. § 10 (1940 Ed.), and 18 U.S.C. § 2385 (1948 Ed.), in violation of 18 U.S.C. § 11 (1940 Ed.), being section 3 of the Smith Act, while such section remained effective, and thereafter in violation of 18 U.S.C. § 371 (1948 Ed.), by (1) unlawfully, wilfully, and knowingly advocating and teaching the duty and necessity of overthrowing and destroying the Government of the United States by force and violence as speedily as circumstances would permit; and (2) by unlawfully, wilfully, and knowingly organizing, and helping to organize, as the Communist Party of the United States, a society, group, and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit.

The indictment charged that it was a part of the conspiracy that the defendants and their co-conspirators would become members, officers, and functionaries of the Communist Party; would in those capacities assume leadership of the party and responsibility for carrying out its policies and activities; would cause to be organized groups, clubs, sections, and national, state, district, and city units of the party in the States of Colorado, Utah, New York, and elsewhere; would recruit, and encourage the recruitment of members of the party, concentrating upon recruiting persons employed in key basic industries and plants; would publish and circulate, and cause to be published and circulated, books, articles, magazines, and newspapers teaching and advocating the duty and necessity of overthrowing and destroying the Government of the United States by force and violence as speedily as circumstances would permit; would write, and cause to be written, articles and directives in the publications of the Communist Party, including but not limited to "Political Affairs", "Daily Worker", and "The Worker", teaching and advocating the necessity of overthrowing and destroying the Government of the United States by force and violence as speedily as circumstances would permit; would conduct, and cause to be conducted, schools and classes in which recruits and members of the Communist Party would be indoctrinated in the principles of Marxism-Leninism and in which would be taught and advocated the duty and necessity of overthrowing and destroying the Government of the United States by force and violence as speedily as circumstances would permit; would agree upon, and carry into effect, detailed plans for the vital parts of the Communist Party in the United States to go underground, in the event of emergency, and from such underground position to continue in all respects the conspiracy; would use false names and false documents in order to conceal their identities and activities as members and functionaries of the Communist Party; and would do other and further things to conceal the existence and operations of such conspiracy.

The defendants were without counsel. The court appointed eleven members of the Bar in Colorado to act as their coun-

sel. Later, retained counsel represented one of them. Including recesses and intermissions, the trial consumed about sixty days. All of the defendants were found guilty and were sentenced to imprisonment for specified periods and to pay fines in specified amounts, respectively. Separate appeals were seasonably perfected and the causes were brought here on a single record. For convenience and clarity, appellant Arthur Bary will sometimes be referred to as Bary, appellant Anna Bary as Anna, appellant Harold Zepelin as Zepelin, appellant Lewis Martin Johnson as Johnson, appellant Joseph William Scherrer as Scherrer, appellant Maia Scherrer, as Maia, and appellant Patricia Julia Blau as Patricia.

A motion was filed in the case to dismiss the indictment. One ground of the motion was that the array of the grand jury was defective in that it was not selected, drawn or summoned in accordance with law; that there had been a systematic exclusion therefrom by the clerk and the jury commissioner of Negroes, persons of Spanish-American or Mexican descent, and other minority groups; that there had been a systematic exclusion of manual workers and wage earners; that the representation of Negroes, persons of Spanish-American or Mexican descent, other minority groups, manual workers, and wage earners, had been limited to token representation; that the array had been weighted in favor of and dominated by representatives of the owner-manager groups of the community; and that the clerk had failed to carry out the statutory and constitutional mandate to employ methods and procedures which would insure representation of a cross section of the community. And based upon similar grounds, a motion was lodged to quash the panel from which the petit jury would be drawn to try the case. While officials charged with the responsibility of selecting names of persons for service on grand and petit juries may exercise some discretion to the end that competent persons be selected, it is the long and unbroken tradition that methods and procedures must be employed which contemplate grand and petit juries from and truly representative of the cross-section of the community. It is not essential however that every grand jury or petit jury include representatives of all racial, economic, or social groups of the community. Neither is exact proportional representation of ethnic, economic, or social groups a prerequisite to validity. Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839. But an indictment returned by a grand jury or a verdict of guilty returned by a petit jury in a criminal case cannot stand if representatives of such groups were systematically and arbitrarily excluded from the list of persons from which such grand jury or petit jury was chosen. Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866.

With these general principles serving as directing guides, the court conducted a hearing upon the challenge to the array of the grand jury and the panel of the petit jury. The clerk, three of his deputies, and the jury commissioner testified. A complete explanation was given of the methods and procedures employed in making up the lists from which arrays or panels of grand and petit juries were selected. And the crux of the testimony was that there had not been any systematic exclusion or token representation of Negroes, persons of Spanish-American descent, manual workers, wage earners, or members of lower economic groups. In connection with the challenge, appellants filed a motion for permission to examine the questionnaires sent out during the last ten years, and to examine other records in the office of the clerk. The court entered an order permitting appellants to examine the grand and petit jury panels for the last four years; permitting appellants to examine all of the questionnaires returned within the last four years but providing that the examination of the questionnaires should be made in the presence of an employee

of the clerk and that such employee should keep the name and address on each questionnaire confidential; and permitting appellants to examine all letters, records, books, and other papers which may have been used by the clerk in selecting names for the arrays or panels during the last four years. Dissatisfied with the examination of the questionnaires in the manner specified in the order, appellants later filed a motion for permission to examine them completely. The thrust of the motion was for permission to examine the questionnaires particularly in respect to names and addresses of the persons who signed and delivered or forwarded them to the clerk. The motion was denied. And based in part upon the testimony adduced at the hearing, in part upon the records of the court, and in part upon its knowledge of conditions in Colorado, the court found that there had not been any systematic exclusion or token representation of the groups referred to in the challenge. The court was not required by statute, rule, or otherwise, to make the names and addresses on the questionnaires available to appellants for examination and scrutiny. Whether they should be made available for such purpose was a matter resting in the sound discretion of the court. And there being no showing of total exclusion from the lists of persons within the groups referred to in the challenge to the array or panel of grand and petit juries, there being evidence that there had not been any systematic or token representation of persons within such groups, and the court having expressly found with supporting foundation that there had been no systematic exclusion or token representation of that kind, it cannot be said that the denial of the motion for permission to examine the questionnaires in respect to addresses and signatures of the persons who returned them to the clerk constituted prejudicial error.

 Another ground in the motion to dismiss the indictment was that the Smith Act as applied to this case is unconstitutional. The contention was and is that the act abridges the freedom of speech expressly protected by the First Amendment. Since the contention presents an asserted abridgement of the fundamental right of free speech, its consideration requires a sensitive awareness of the delicacy of the question involved. Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; Dunne v. United States, 8 Cir., 138 F.2d 137, certiorari denied, 320 U.S. 790, 64 S.Ct. 205, 88 L.Ed. 476. But the contention is not entirely new. It does not find its source in virgin soil. It is now the definitely charted rule that mere advocacy in the abstract that the Government should be overthrown and destroyed, if unrelated to any effort to incite or instigate action to that end by force and violence, falls within the range of free speech protected by the First Amendment. But at the same time there is no area for doubt that as a reasonable concomitant of the right of the Government to protect itself against overthrow or destruction by force and violence from within, Congress may enact legislation making penal declarations, statements, utterances, or teachings in the nature of incitement to action intended to produce the forbidden result of overthrow or destruction by force and violence. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L. Ed.2d 1356. And it is not essential that incitement in the form of speech be directed only to the actual and immediate step of employing force and violence for the purpose of bringing about such overthrow or destruction. It is enough if the incitement is directed with intended precision to the taking of steps or the doing of things in preliminary preparation for the employment of force and violence in an effort to effectuate the overthrow or destruction of the Government when the propitious moment is at hand. And therefore in its application to a case in which incitement of that nature is shown to exist, the Smith Act is not open to successful attack for constitutional invalidity. Dennis v. United States, supra; Yates v. United States, supra.

■ A further ground of the motion to dismiss the indictment was that the indictment did not relate the overt acts pleaded therein to the alleged conspiracy. Eleven overt acts were pleaded. In its instructions, the court withdrew two from the jury. Those submitted to the jury were attending and participating in meetings of members of the party, attending and participating in a school of the party, and using aliases. The essence of the argument attacking the sufficiency of the overt acts pleaded and proved is that overt acts must be in furtherance of the conspiracy; and that attending and participating in meetings of members of the party, attending and participating in schools or educationals conducted by the party, expressing views in respect to books, writings, and literature, and using aliases were not acts in furtherance of the conspiracy charged in the indictment. While an overt act was essential to render punishable the conspiracy charged in the indictment, it was not necessary that the act itself be unlawful if performed in furtherance of the conspiracy. Carlson v. United States, 10 Cir., 187 F.2d 366, certiorari denied, 341 U.S. 940, 71 S.Ct. 1000, 95 L.Ed. 1367. And no elaboration is required to make clear that attending and participating in meetings held and attending and participating in educationals conducted for the purpose of advocating, promoting, or furthering incitement to action in an effort to overthrow the Government by force and violence were overt acts in furtherance of the conspiracy charged in the indictment.

■ And still another ground of the motion to dismiss the indictment was the failure of the indictment to charge that either the conduct of appellants or the situation at the times complained of, or both, constituted a clear and present danger that the Government would be overthrown by force and violence. But the existence of near and present danger created or arising out of the acts and conduct of appellants, or the situation existing at the times referred to, was not an essential element of the crime to be charged in the indictment. It was merely a judicial yardstick to be used by the court in determining whether the First Amendment immunized from punishment the statements, utterances, and teachings of appellants, or whether they fell within the range of the Smith Act. Dennis v. United States, supra. After the introduction of evidence had been concluded and before the arguments to the jury began, a motion was filed for a hearing for the presentation of evidence upon the issue of the existence of a near and present danger required by the Constitution. The court was not obliged to hold a hearing and permit the introduction of evidence relating to the question of near and present danger. It was within the province of the court to determine the question of law based upon common knowledge of conditions currently existing throughout the world and throughout the United States, particularly conditions relating to ideological trends and levels to which nations and peoples were then attuned, of which the court could take notice without the introduction of evidence bearing thereon. Based upon its knowledge of such conditions, the court concluded as a matter of law that there was a clear and present danger arising out of statements, utterances, and teachings of appellants which justified the application of the Smith Act in the case, and that such application did not violate the First Amendment. And we are not persuaded that the determination should be overturned.

■ The question of limitation was appropriately presented to the trial court and preserved for review on appeal. One object of the conspiracy charged in the indictment was organizing and helping to organize, as the Communist Party of the United States, a group of persons who teach and advocate the overthrow of the Government by force and violence. The evidence adduced at the trial showed without conflict that the Communist Party, as it existed at the time of the return of the indictment, was organized in New York City in 1945. The indictment was not returned until 1954. And

the period of limitation fixed by the controlling statute is three years. 62 Stat. 828, 18 U.S.C. § 3282. Following the then definite trend of judicial viewpoint, the trial court denied the plea of limitation; instructed the jury that the word "organize", as used in the Smith Act, included the recruiting of members, the forming of new units, and the regrouping or expansion of existing units of any society, party, group, or other organization; and further instructed the jury in effect that if they found that the conspiracy to organize or help to organize the Communist Party began on or about April 1, 1945, and continued thereafter until the return of the indictment, or at any time within three years prior thereto, they could properly convict such of the appellants as were parties to such conspiracy within the three year period. But it is now the settled law that in respect to the charge of conspiring to organize or help to organize, as the Communist Party, a group of persons who teach and advocate the overthrow of the Government by force and violence, the period of limitation began to run at the time the party was organized in 1945. Yates v. United States, supra. The Communist Party having come into existence in 1945, and the indictment having been returned in 1954, the three-year statute of limitations had run on the organizing charge contained in the indictment, and therefore such charge should have been withdrawn from the consideration of the jury. Yates v. United States, supra.

■ While not set out separately as one of their main contentions, appellants argue that error was committed in the admission of certain evidence. It is particularly urged that the court erred in admitting the testimony of the witness Lautner in which he detailed his career as a member of the Communist Party covering a period of approximately fifteen years and testified as an expert in respect to the ultimate aims and objectives of the party. And it is also urged that the court erred in admitting other evidence. It is sufficient to say without detailed discussion that we think the tes-

timony of the witness Lautner was admissible, and that we are unable to share the view that appellants suffered prejudicial consequences from the admission of the other evidence now challenged.

■ The court instructed the jury that the Smith Act was not aimed against the teaching of the mere abstract doctrine of overthrowing the Government or the mere teaching of the historical doctrine of Marxism or Leninism; that the Communist Party and its members were entitled to do that so long as their teaching did not go to the extent of advocating action for the accomplishment of a violent revolution by language reasonably and ordinarily calculated to incite persons to action; and that any advocacy or teaching which did not include the urging of force and violence as the means of overthrowing and destroying the Government was not within the issues of the indictment and constituted no basis for a finding against the appellants. The sufficiency of the evidence to establish incitement to action in an effort to overthrow the Government by force and violence is challenged. It is argued that the evidence merely disclosed advocacy in the abstract, divorced from or unrelated to incitement to action. The evidence, considered in its totality, tended to establish these facts and circumstances. Given certain objective and subjective conditions, the ultimate aims and objectives of the Communist Party were the destruction of imperialism and its governments through force and violence, the establishment of the dictatorship of the proletariat, and the establishment of socialism. Appellants were active members of the party, held official positions in the party attended meetings of the party, attended educationals of the party, some of them addressed meetings of the party, some of them taught in educationals of the party, and some of them were central figures in the control of the party in Colorado and in certain adjoining states. Bary was organizer and state chairman in Colorado; was a member of the state board; was regional director; attended and taught in education-

als; and attended two national conventions. Anna was a member of the state board in Colorado; was on a section committee; was a party organizer; attended and taught in educationals; and was a delegate to one national convention. Zepelin acted for a time as state chairman in Colorado; was a member of the state board; was a member of a review committee; was chairman of a youth committee; was a member of an educational committee; and attended meetings and educationals. Johnson was a member of the state board in Arizona; was organizer for Utah; attended meetings in Arizona, Utah, and Wyoming; and attended and taught in educationals. Scherrer was organizer for the section at Boulder, Colorado; was organizer for the section at Pueblo, Colorado; attended meetings; and attended and taught in educationals. Maia began her party activities in New York. Later, she was a member of the state board in Colorado; was a member of the educational and labor committee; attended meetings; and attended and taught in educationals. And Patricia was a member of the state board in Colorado; was organizational secretary; was organizer for the section at Pueblo, Colorado; was a delegate to a national convention; attended meetings; and attended and taught at educationals. At the meetings and educationals, Marxism-Leninism was expounded, taught, and studied as the preferred form of government; and in connection therewith certain well recognized literature expounding such viewpoint was used. Meetings were held in secret; sometimes curtains were drawn; sometimes voices were lowered at meetings; sometimes fictitious names were used at meetings; sometimes those attending went to and from meetings in small numbers as a means of avoiding notice or detection; and in some instances, aliases were used in dealing with outsiders.

In the course of a certain educational, Bary stated that the basic strategy of the party was to overthrow the existing government by revolution. During another educational, he stated that the socialist revolution would never come about without the use of force and arms. On a similar occasion, he said that capitalism was not going to let Communists take over peacefully; that capitalism was not going to fall by its own accord; and that Communists would have to shove it in. On still another occasion, he stated that Communists had to overthrow the capitalist machinery and substitute for it proletarian machinery; and that the Communists had to immediately organize an army to crush all of the resistance and meet the counter-revolution. In making a report to the state board of a national convention which he and Patricia attended, he stated that it was the policy to concentrate activities within key basic industries; and that in Colorado such industries would be steel, meat packing, rubber, and coal mining. And on another occasion, he stated at an educational that the party was like any army staff, and that the party must put cadres in key industries so that they would be in correct position when the right time came. In a lecture delivered at an educational, he said that their job was to get the politicians to fight and thus create a political crisis; that an economic crisis and then a political crisis were the two prerequisites to the revolution itself; and that the job of members of the party was to work for peace as a tactic, to establish an economic crisis and also to work in the political field. He was present at a meeting when a speaker said that the workers would create a force and through such force would resort to violence and that some of them would have to die. He was present at an educational at which a speaker said that Communists must put the party above and beyond everything as the vanguard; that they would take over the state; that they would substitute for it their own machinery; that they would set up a dictatorship of the proletariat; and that they would create an army to smash the resistance. He was present at a meeting at which a speaker said that the party was going to liberate Negro and Mexican workers by revolution. And he was present at a meeting at which a speaker stated that

it was necessary for the party to create a huge Mexican organization in the Southwest to overthrow the capitalists.

In the course of addressing an educational, Anna said that force was the midwife of every old society pregnant with the new. In the course of another address she said that the party was going to work among Negro and Mexican workers and liberate them by revolution. On still another occasion, she said in the presence of others that the party was going to educate Negroes, was going to supply them with leadership, and after fully educating them was going to liberate them by revolution. And on a different occasion, she said that if the party was in power in steel, meat packing, rubber, and mining industries in Colorado and there were strikes, they would be in position to shut down such industries and thus affect the economy of the region and the nation. She was present at a meeting when a speaker said that it was necessary to create a huge Mexican organization in the Southwest to overthrow the capitalists; was present at an educational when Bary compared the party to an army staff and talked of having cadres in correct position in key industries when the proper time came; was present at a meeting at which Zepelin said that if an attempt was made to outlaw the party, it would go underground; and was present at a meeting when a speaker said that the workers would create a force and through it would resort to violence, and that some of them would have to die.

Zepelin stated at an educational that the party through the workers of the United States and the world was going to lead the workers out from under oppression by revolution. He said at a meeting that the party must organize the Negro and Mexican people, and that the party would fight for the liberation of such people. And he said at a different meeting that if an effort was made to outlaw the party, it would go underground. He was present on the occasion when Bary stated that capitalism would not let the Communists take over peace-fully; was present when Bary said that the party should concentrate its work in key industries; was present when Anna said that if the party was in power among workers in the basic industries in Colorado and there were strikes, they could take over and have an effect on the regional and national economy; was present when Anna said that the party would liberate Negro and Mexican workers by revolution; was present at a meeting at which a speaker said that it was necessary to create a huge Mexican organization in the Southwest to overthrow the capitalists; and was present on the occasion at which the speaker said that the workers would create a force and through it would resort to violence, and that some of them would have to die.

Johnson said in the course of an educational that every member of the party should be willing to give up his life for the cause if necessary. At a state board meeting, he said that the socialist revolution would come within the next five years. At a club meeting at which recruiting was discussed, he said that they were trying to recruit a lot of people in the name of William Z. Foster and urged his listeners to make a sincere effort to bring someone into the party; and he read a letter from the national organization secretary addressed to all clubs in which it was said that the workers wanted ed militant leadership of day to day struggle in the shops and working class communities. He was an instructor at an educational during which one of the leaders was asked whether it was possible to overthrow the government without force and violence. The person to whom the question was propounded answered by asking the question "Do you think they would give up the reins of government without a fight?" He was present at an educational when Bary said that the basic strategy of the party was the overthrow of existing government by revolution; and was present on another occasion when Bary stated to those attending an educational that the socialist revolution would never come about with-

out the use of force and arms. And he was present at an educational at which a speaker said that the workers in France had been able to take over the industries and factories; that the party in France was not strong enough to take over the government; that there were enough labor unions in this country to take over the industries "but we shouldn't attempt to do that until the Party was strong enough to take over the Government."

On one occasion Scherrer said to a group that the transition from capitalism to socialism could not be effected by a slow change and could only be effected by a revolution. On another occasion, he stated to a group that workers in the United States could relieve their oppression just as the workers in Russia did by revolution. On a different occasion he stated to a group that Negroes should have the right to govern themselves, make their own laws, and have complete autonomy as the people of the Ukraine did. On another occasion, he stated how Negroes in the South could protect themselves with arms and face terrific odds against them, and that people anywhere could protect themselves at any time against terrific odds by taking up arms and using force. And on still another occasion, he said workers in Bessemer, Alabama, had some pitched battles; that a local leader was successful in using firearms; that the Communists could get in power in Pueblo through the Union; and that they could have their labor difficulties and do the same as was done in Bessemer. He was present when Anna said that force was the midwife of every old society pregnant with the new; was present at an educational when Zepelin said that the party through the workers of the United States and the world was going to lead the workers out from under oppression by revolution; was present at a group meeting when Maia said that after civil, legal, and political means were exhausted, Negroes should take up arms to protect themselves; and was present when a speaker said that workers would create force and through it would resort to violence and that some of them would have to die.

On an occasion fixed in the record, Maia said in the course of a meeting that after all civil, legal, and political means had been exhausted, Negroes should take up arms to protect themselves. On another occasion, she said that the party was going to supply leadership to millions of workers and that as the result they were going to liberate them by revolution. And she said at a meeting that she thought it was not impossible to get some members of the party in the Ordnance Depot at Pueblo, and that it could be done very silently and safely. She was present when Anna said that force was the midwife of every old society pregnant with the new; was present when Anna said that the party would liberate the Negro and Mexican workers by revolution; was present when Anna said that if the party was in power among the workers in the basic industries in Colorado and there were strikes, they could affect the regional and national economy; and was present when Zepelin said that if an effort was made to outlaw the party, it would go underground. She was present when Scherrer said that Negroes could use arms to protect themselves; was present when he talked of autonomy for Negroes like that in the Ukraine; and was present when he said that workers in the United States could relieve their oppression just as workers in Russia did by revolution. She was present when Bary compared the party to an army general staff and talked of having cadres in correct position when the right time came; was present when Zepelin said the party must organize the Negro and Mexican people, and that it would fight to liberate the Negro people; was present when Patricia said that it was necessary to create a huge Mexican organization in the Southwest to overthrow the capitalists; and was present when the speaker at a meeting said that the party would create a force and through it would resort to violence, and that some of them would have to die.

Patricia stated in the course of a meeting that it was necessary to create a huge Mexican organization in the Southwest to overthrow the capitalists; and on an-

other occasion, she said that it would be very fine if certain dissatisfied persons working at White Sands and Los Alamos, New Mexico, could be brought into the party because they were working on such highly secret and important government projects. She was present when Bary said that the party should concentrate work in key basic industries; was present when Maia said that members of the party could be got into the Ordnance Depot at Pueblo very silently and very safely; and was present when Zepelin said that the party should organize the Negro and Mexican people as allies, and that the party would fight for the liberation of the Negro nation.

The evidence did not merely disclose advocacy, utterances, or teachings in the abstract—unrelated to or divorced from incitement to action—that the democratic form of government in the United States should be overturned or terminated through peaceful methods and means of education or otherwise and be superseded by a different form of government. Neither did it merely disclose discussion or exposition of violent overthrow as an abstract theory. Considered in its totality, the evidence disclosed as to each of the appellants incitement and advocacy of action in an effort to overthrow the Government by force and violence as speedily as circumstances would permit, within the intent and meaning of the Smith Act, supra. Compare Dunne v. United States, supra; United States v. Dennis, 2 Cir., 183 F.2d 201, affirmed, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Frankfeld v. United States, 4 Cir., 198 F.2d 679, certiorari denied, 344 U.S. 922, 73 S.Ct. 389, 97 L.Ed. 710; United States v. Flynn, 2 Cir., 216 F.2d 354, certiorari denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713.

 Complaint is made respecting the closing argument of the United States Attorney to the jury. The contention is that portions of the argument were inflammatory and reasonably calculated to arouse prejudice against appellants; and that portions amounted to references by innuendo to the failure of appellants to testify in their own behalf. In the course of his argument, the United States Attorney stated to the jury that the appellants were traitors. At one juncture, he referred to the cold war between Governments of the United States and Russia; referred to the possibility of actual war between the two nations; and clearly inferred that in the event of such war, he believed appellants would be on the side of Russia. At another juncture, he referred to Klaus Fuchs and the Rosenbergs in a manner from which it could be inferred that in his opinion appellants should be placed in the same category with Fuchs and the Rosenbergs. And the final words of the argument were that the jury could return a verdict in favor of America. It is the recognized privilege of counsel to indulge freely in fair argument to the jury. But there are certain well established limits beyond which counsel is forbidden to go even in a moment of enthusiasm, ardor, or zeal. The portions of the argument referred to were reasonably calculated to arouse prejudice against appellants and therefore exceeded permitted bounds. Viereck v. United States, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734; August v. United States, 8 Cir., 257 F. 388. But with this word of caution, it is confidently believed that like argument will not be repeated on the subsequent trial of the case. Appellants offered no testimony except the honorable discharges from the Army of Zepelin and Scherrer. No express reference was made in the argument of the United States Attorney to the failure of appellants to testify in their own behalf. Fairly construed, the substance of the argument challenged upon the ground that it constituted a reference to the failure of the appellants to testify was that the evidence adduced by the Government made a clear case of guilt and that no one testified to the contrary. And argument of that kind is not open to attack.

 Exceptions were taken to portions of the instructions given to the jury. No good purpose would be served by reviewing them seriatim.

The instructions should be considered in their entirety. Particular portions should not be separated and considered apart from the whole. Martin v. United States, 10 Cir., 100 F.2d 490, certiorari denied, 306 U.S. 649, 59 S.Ct. 590, 83 L.Ed. 1048; Graham v. United States, 10 Cir., 120 F.2d 543; Moffitt v. United States, 10 Cir., 154 F.2d 402, certiorari denied, 328 U.S. 853, 66 S.Ct. 1343, 90 L.Ed. 1625; Lunsford v. United States, 10 Cir., 200 F.2d 237; Haskell v. United States, 10 Cir., 241 F.2d 790, certiorari denied, 354 U.S. 921, 77 S.Ct. 1379, 1 L. Ed.2d 1436. Considered in that manner, the instructions, except in respect to the charge of conspiring to organize and help to organize the Communist Party, covered carefully, correctly and adequately the issues in the case and were not open to the exceptions taken. Certain requested instructions were denied. There is no need to discuss them in detail. Even though a requested instruction be a correct statement of applicable law, its refusal does not constitute error if the issues in the case have been correctly and adequately covered in the general instructions given. Agnew v. United States, 165 U. S. 36, 17 S.Ct. 235, 41 L.Ed. 624; Troutman v. United States, 10 Cir., 100 F.2d 628; Berenbeim v. United States, 10 Cir., 164 F.2d 679, certiorari denied, 333 U.S. 827, 68 S.Ct. 454, 92 L.Ed. 1113; Thayer v. United States, 10 Cir., 168 F.2d 247; Dickson v. United States, 10 Cir., 182 F.2d 131; Haskell v. United States, supra.

■■■ The final ground of attack upon the judgments and sentences is that appellants were deprived of a fair and impartial trial in violation of the Fifth and Sixth Amendments. It is conceded that appellants were accorded all of the formalities required by law in obtaining a fair and impartial trial. But it is argued that a climate of prejudice, passion, and fear existed at the time they were brought to trial; that the verdict of the jury was foreordained from the start; that appellants were tried and convicted of a conspiracy of "thought", a conspiracy of "ideas", and a conspiracy of "speech" through the medium of omnibus utilized by the prosecution accurately described as "guilt by association"; and that they were tried and convicted without any evidence of a conspiracy of action on their part directed toward the overthrow of the Government by force and violence. The record fails to supply solid footing for the contention. There was evidence of a conspiracy to make statements and utterances reasonably intended and calculated to promote and encourage incitement to concrete action in an effort to overthrow the Government by force and violence as speedily as circumstances would permit; and there is no indication that appellants were victims of a general atmosphere of prejudice, passion, or fear, which entered into the trial of the case or the final outcome thereof.

For the error in failing to withdraw from the jury on the ground of limitation the charge of a conspiracy to organize and help to organize, as the Communist Party, a group who teach and advocate the overthrow of the Government by force and violence, the judgments are severally reversed and the causes are severally remanded for a new trial as to all of the appellants.

PHILLIPS, Circuit Judge (concurring).

The indictment in the instant case charged that from April 1, 1945, to the date of the indictment, the defendants unlawfully, wilfully and knowingly conspired with each other and 13 named conspirators (being the defendants in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137) and with other persons unknown to the grand jury by (1) unlawfully, wilfully and knowingly advocating and teaching the duty and necessity of overthrowing the Government of the United States by force and violence and by (2) unlawfully, wilfully and knowingly organizing or helping to organize as the Communist Party of the United States a socie-

ty, group and assembly of persons to teach and advocate the overthrow and destruction of the Government of the United States by force and violence, all with the intent of causing the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit.

In approaching the questions here presented for review, we should keep in mind, as stated by Mr. Justice Frankfurter in his concurring opinion in Dennis v. United States, 341 U.S. 494, 546, 71 S.Ct. 857, 886, "The Communist Party was not designed by these defendants as an ordinary political party." Its actual character was well stated by Mr. Justice Jackson in his concurring opinion in American Communications Ass'n v. Douds, 339 U.S. 382, 424–432, 70 S. Ct. 674, 696, 94 L.Ed. 925, as follows:

"From information before its several Committees and from facts of general knowledge, Congress could rationally conclude that, behind its political party facade, the Communist Party is a conspiratorial and revolutionary junta, organized to reach ends and to use methods which are incompatible with our constitutional system. A rough and compressed grouping of this data would permit Congress to draw these important conclusions as to its distinguishing characteristics.

"1. *The goal of the Communist Party is to seize powers of government by and for a minority rather than to acquire power through the vote of a free electorate.* It seeks not merely a change of administration or of Congress, or reform legislation within the constitutional framework. * * *

"The Communist program only begins with seizure of government, which then becomes a means to impose upon society an organization on principles fundamentally opposed to those presupposed by our Constitution. Its purposes forcibly to recast our whole social and political structure after the Muscovite model of police-state dictatorship. * * *

* * * * * *

"2. *The Communist Party alone among American parties past or present is dominated and controlled by a foreign government.* It is a satrap party which, to the threat of civil disorder, adds the threat of betrayal into alien hands.

"The chain of command from the Kremlin to the American party is stoutly denied and usually invisible, but it was unmistakably disclosed by the American Communist Party somersaulting in synchronism with shifts in the Kremlin's foreign policy. * * *

* * * * * *

"3. *Violent and undemocratic means are the calculated and indispensable methods to attain the Communist Party's goal.* It would be incredible naiveté to expect the American branch of this movement to forego the only methods by which a Communist Party has anywhere come into power. * * *

* * * * * *

"4. *The Communist Party has sought to gain this leverage and hold on the American population by acquiring control of the labor movement.* All political parties have wooed labor and its leaders. But what other parties seek is principally the vote of labor. The Communist Party, on the other hand, is not primarily interested in labor's vote, for it does not expect to win by votes. It strives for control of labor's coercive power—the strike, the sit-down, the slow-down, sabotage, or other means of producing industrial paralysis. * * *

* * * * * *

"5. *Every member of the Communist Party is an agent to execute the Communist program.* What constitutes a party? Major political parties in the United States have

never been closely knit or secret organizations. Anyone who usually votes the party ticket is reckoned a member, although he has not applied for or been admitted to membership, pays no dues, has taken no pledge, and is free to vote, speak and act as he wills. Followers are held together by rather casual acceptance of general principles, the influence of leaders, and sometimes by the cohesive power of patronage. Membership in the party carries with it little assurance that the member understands or believes in its principles and none at all that he will take orders from its leaders. \* \* \*

"Membership in the Communist Party is totally different. The Party is a secret conclave. Members are admitted only upon acceptance as reliable and after indoctrination in its policies, to which the member is fully committed. They are provided with cards or credentials, usually issued under false names so that the identification can only be made by officers of the Party who hold the code. Moreover, each pledges unconditional obedience to party authority. Adherents are known by secret or code names. They constitute 'cells' in the factory, the office, the political society, or the labor union. For any deviation from the party line they are purged and excluded."

It seems to me that notwithstanding the general phraseology of the Smith Act,[1] 18 U.S.C. § 2385, we may assume, as a matter of common knowledge, that the primary purpose of the Act was to combat the Communist conspiracy, the object of which was to effect the overthrow of the Government of the United States by force or violence.

The Communist Party of the United States was organized in 1919. The Act was passed in 1940. Therefore, the term "organize" as used in the Act, if narrowly construed, could not have reached the act of organizing the Communist Party, except for the fortuitous reorganization of that party in 1945, an occurrence which could not have been foreseen in 1940. Because of those facts, it is my personal opinion that the word "organize" in the Act means more than the original organization or reorganization of the Communist Party. The life of a political party is one of continuous organization and reorganization. I think the term "organize" should be given the connotation of a continuous process. The leaders of the Communist Party at the time the Act was passed so used the term "organize" with respect to activities of its workers and denominated "organizers." It is true that criminal statutes are to be strictly construed, but they are not to be construed so strictly as to defeat the obvious purpose of the legislature. However, my personal opinion is of little moment. The Supreme Court of the United States has adopted the narrow construction of the word "organize" and we are bound by that construction.

It should be kept in mind that the charge is not advocacy itself, but a conspiracy to advocate, and that it was the existence of the conspiracy which created the danger.[2]

I think the evidence clearly established that the conspiracy was formed in 1945 and continued to the date of the indictment and that each of the defendants became parties to that conspiracy.

The intent to bring about the overthrow of the Government by force and violence was an element of the offense, but those who recruit and combine for the purpose of advocating overthrow intend to bring about that overthrow.[3]

Of course, the teaching of the principles, doctrines and objects of the Communist Party as abstract concepts does not come within the purview of the Act.

---

1. Hereinafter called the Act.
2. See Dennis v. United States, 341 U.S. 494, 511, 71 S.Ct. 857, 95 L.Ed. 1137.
3. Dennis v. United States, 341 U.S. 494, 499, 71 S.Ct. 857, 862.

The Act is directed to advocacy, not discussion.[4] But one would be naive, indeed, who would believe that the defendants, who were militant communists, in their teaching and advocacy of communism, as established by the evidence, were interested in communism merely as an abstract doctrine.

I think it was unnecessary for the Government to establish that the defendants taught or advocated immediate action, looking to the overthrow of the Government by force or violence, even though the statute requires as an essential element of the crime, proof of intent of those charged with its violation to overthrow the Government by force or violence. Certainly, it was not necessary to establish that the conspiracy had proceeded to the point where the plans had been fully laid, the signal for action awaited and the putsch about to be executed.[5]

Moreover, it was not essential for the Government to establish the probable success of the attempt. An attempt to overthrow the Government by force, even though doomed from the outset, was an event within the competency of the Congress to prevent.[6]

It is my conclusion that the evidence, as delineated by Judge Bratton in his opinion, established the formation and continuation of the conspiracy as charged; that the defendants became parties to the conspiracy; that they attempted to indoctrinate members of the Communist Party in the object of the conspiracy and to commit them to a course whereby they would strike when the leaders felt the circumstances were propitious;[7] that they advocated affirmative steps to be taken in preparation for and looking to an ultimate attempt to overthrow the Government by force and violence at a propitious time; and that

such evidence was sufficient to establish the conspiracy to advocate the overthrow of the Government of the United States by force and violence.

---

4. Dennis v. United States, 341 U.S. 494, 502, 71 S.Ct. 857, 863.

5. Dennis v. United States, 341 U.S. 494, 509, 71 S.Ct. 857, 867.

6. Dennis v. United States, 341 U.S. 494, 509, 71 S.Ct. 857, 867.

7. See Dennis v. United States, 341 U.S. 494, 509, 71 S.Ct. 857, 867.