William Howard CRAWFORD, Petitioner,

v.

STATE of Alaska, Respondent.

No. 637.

Supreme Court of Alaska.

Dec. 20, 1965.

Peter J. Kalamarides and Edward J. Reasor, Anchorage, for petitioner.

Warren C. Colver, Atty. Gen. of Alaska, Juneau, John K. Brubaker, Dist. Atty., Anchorage, and John L. Devney, Asst. Atty. Gen., for respondent.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

DIMOND, Justice.

The grand jury that indicted petitioner for first degree murder was made up of persons residing within a fifteen mile radius of the City of Anchorage. The question to be decided is whether such a geographical limitation on the selection of jurors is lawful. The court below held that it was and denied petitioner's motion to dismiss the indictment. We have granted review of such interlocutory order because it affects a substantial right of petitioner and involves a question of general importance

in the administration of justice throughout the entire court system.[1]

The presiding superior court judge of each of Alaska's four judicial districts is the responsibility under law of selecting persons to serve on petit and grand juries. The selection is made from a list of names of persons residing in the district who are qualified by law for jury service and who voted in the state general election immediately preceding the preparation of the list of prospective jurors.[2] The names of those eligible for jury service, or numbers corresponding with the names, are placed in a box, and a public drawing of jurors then takes place.

Shortly after the establishment of the state court system in 1960, the presiding judge for the Third Judicial District adopted a policy of summoning for jury duty in the City of Anchorage only those persons whose presence could be obtained without undue hardship or expense. Under this policy, jurors were selected, not from the entire district, but only from those areas within the district that were served by highway or by reasonably regular and frequent air service.

After about two years of experience, the presiding judge found that the cost of utilizing jurors from outside the Anchorage area was very large and, in his opinion, quite unnecessary. He thereupon abandoned the original policy of selecting jurors, and adopted the existing policy of calling as jurors for jury functions to be performed in the City of Anchorage only those residents of the Third Judicial District who resided within a fifteen mile radius of the city.

 Petitioner claims that such a geographical limitation on the selection of jurors is in violation of AS 09.20.070.[3] This statute permits the court to reject the name of any person drawn for jury duty if it appears to the satisfaction of the court that such "person's attendance * * * may involve a large and unnecessary expense." [4] Petitioner contends that under such provision in the law the court is required to make an independent appraisal of what may amount to a "large and unnecessary expense" in each separate situation on a name to name basis, and that the statute does not empower the court to make a blanket rule based on a fixed geographical limitation of the area from which jurors should be drawn.

 We disagree with petitioner. The legislature has given to the superior court the power to determine whether jurors should be summoned from less than the entire judicial district.[5] The standard

1. Alaska Supreme Ct.R. 23–24. Knudsen v. City of Anchorage, 358 P.2d 375, 376 (Alaska 1960).

2. AS 09.20.050–09.20.070, 12.40.010, 12.-45.010.

3. Petitioner does not attack the constitutionality of AS 09.20.070.

4. AS 09.20.070 provides:
 Under the direction of the court the clerk shall conduct the public drawing of jurors for the panel by shaking the box to mix the named or numbered pieces. The clerk shall than draw as many names or numbers as are ordered by the court to fill the jury panel. If the name or number of a person is drawn from the box and the person is deceased, unqualified, disqualified, or the person's attendance cannot be obtained within a reasonable time or

 may involve a large and unnecessary expense, and the fact appears to the satisfaction of the court through the use of questionnaires or otherwise, the court may reject the name of that person and direct that the name or number of another be drawn in his place.

5. See Yoho v. United States, 202 F.2d 241, 14 Alaska 174 (9th Cir. 1953), which was decided under § 55–7–36 ACLA 1949 which contained similar language to AS 09.20.070. Compare 28 U.S.C.A. § 1865(a). Lewis v. United States, 279 U.S. 63, 49 S.Ct. 257, 73 L.Ed. 615 (1929); Ruthenberg v. United States, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414 (1918); United States v. Titus, 210 F.2d 210 (2d Cir. 1954); United States v. Gottfried, 165 F.2d 360 (2d Cir.), cert. denied 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1129 (1948).

which guides the court in making such determination is whether a large and unnecessary expense is involved in obtaining jurors from all parts of the district. The legislature has not specified how the court should make that determination, whether on a name to name basis, as petitioner suggests, or by way of a general rule, as the court has done in this case. This is a question for the court to determine in its discretion. The only question that we must be concerned with is whether in exercising its discretionary authority the court had a rational, factual and legal basis for what it did.

■ We find that the presiding judge had a reasonable basis for concluding that a large expense would be involved in summoning jurors from outside the Anchorage area. In opposition to petitioner's motion to dismiss the indictment, the state filed the affidavit of Judge Davis, who was presiding judge of the superior court at the time the policy mentioned was adopted. According to Judge Davis, the expense in summoning jurors outside the Anchorage area would be large because of transportation costs that the state would be required to pay if a juror were summoned from a place more than fifteen miles distant from the City of Anchorage.[6] In addition, Judge Davis stated that population beyond the fifteen mile radius was very scattered, and in order to bring in an additional large population group it would be necessary to ex-

tend the radius out to fifty or sixty miles. This would be expensive to the state, not only because of transportation costs, but also because of the per diem that the state would be obliged to pay if it was impracticable for jurors to return to their homes each evening.[7]

The judge was also satisfied that such a large expense was unnecessary. He stated in his affidavit that approximately 70% of the population of the Third District is concentrated in the Anchorage area,[8] and that that area constituted a very cosmopolitan community which included most, if not all, of the racial, economic, occupational and religious groups found in the Third District.

It is on the question of necessity or lack of it in limiting the selection of jurors to the geographical area established by the court, that petitioner takes issue with the state. It is petitioner's contention that it is necessary to incur the expense of summoning jurors from most, if not all of the whole judicial district in order to protect petitioner's constitutional rights. Petitioner argues that the present geographical limitation constitutes a systematic and arbitrary exclusion from the panel of grand jurors of certain economical, social, racial and geographical groups. The result of such exclusion, petitioner contends, is to deprive him of equal protection of the laws

6. Admin.R. 17(b) provides:
 Jurors summoned from places more than 15 miles distant from the place of court shall receive reimbursement for round-trip travel performed from the juror's residence to the place of court for the total distance actually and necessarily traveled at the rate of 12 cents a mile. Where air transportation is used, the actual cost of such transportation shall be paid in lieu of mileage.

7. Admin.R. 17(c) provides:
 Where it is impracticable for a juror to return to his home each evening, subsistence at the rate of $21.00 a day shall be allowed for each day of his term of service on the venire.

8. Petitioner takes issues with Judge Davis's statement that approximately 70% of the

population of the Third District is concentrated in the Anchorage area. In support of his motion to dismiss the indictment, petitioner filed the affidavit of Henry Taylor, who stated that based on the 1960 census the total population of the Third District was 118,886 persons, and that of those, 82,833 lived in the Anchorage voting district. This means that 69.674% of the total population of the Third District resides in the Anchorage voting district. Taylor also stated that the Anchorage voting district covered an area larger than a fifteen mile radius of the City of Anchorage, but he did not state how much larger it was or what percentage of the population of the voting district resided outside the fifteen mile area.

as guaranteed by the fourteenth amendment to the federal constitution.

In support of this argument, petitioner filed affidavits which show substantially the following:

(1) John M. Savage, a practicing attorney in Anchorage, stated that he had tried a minimum of 125 jury cases in Anchorage since 1959, and that at no time had he had on a jury panel either a commercial fisherman, an Eskimo, or an Alaskan farmer.[9]

(2) T. O. Schmidtke, the Mayor of Palmer, Alaska,[10] stated that in the Palmer area about 500 persons are dependent upon farming for their livelihood, and about 430 upon the coal mining industry. He also stated that there were hundreds of homesteaders and land owners throughout the area who lived on their property but who produced no farm products for sale.

(3) Frank Theodore, a resident of Cordova, Alaska,[11] stated that the main industry and economical backbone of the City of Cordova is commercial fishing, that commercial fishermen are definitely a separate economic group of the Third Judicial District, and that the majority of the population of the City of Cordova are commercial fishermen.

(4) Stanley J. McCutcheon, a practicing attorney in the City of Anchorage, stated that he was counsel for the native village of Tyonek, Inc., Alaska,[12] and that there are residing in the village of Tyonek certain Indians who voted in the last general election and who seemingly would qualify to sit as grand and petit jurors under appropriate Alaska law.

(5) John Shaffer, a resident of the central Kenai Peninsula in the Third Judicial District, estimated that within a fifty mile radius of Soldotna, Alaska [13] the population in August 1964 was approximately 3600 people, and that approximately 50% of those people were occupied either as homesteaders or fishermen or a combination of both.

(6) Henry L. Taylor, Jr., a private investigator in the City of Anchorage, stated that of his own knowledge a vast majority of various economic groups reside in the Third District and live outside the fifteen mile radius of the City of Anchorage. Some of these groups, according to Taylor, are farmers, coal miners, homesteaders, oil field workers, ranchers and commercial fishermen. In addition, Taylor stated that more persons of Alaska native extraction, indigenous to and residing in the Third District, live outside a fifteen mile radius of Anchorage than live inside such radius.

In an effort to controvert petitioner's contentions and to show that there was in fact no unconstitutional exclusion from jury service of any particular social, racial, religious, economical or geographical group resident in the Third District, the state filed affidavits which show substantially the following:

(1) Judge Davis stated that in his experience as superior court judge from the date the court system was established in 1960, and as presiding judge from that date until November 1964, that the system of limiting jurors to a fifteen mile radius of the City of Anchorage placed in the jury box people of all races, including the native people of Alaska, all occupations, including

---

9. Affiant appears to be mistaken regarding the number of jury cases he has tried. Court records reveal that instead of having tried a minimum of 125 jury cases in Anchorage since 1959, affiant has tried only 50 such cases in the superior and magistrate courts combined.

10. The City of Palmer has a population of 2,000 persons and is situated approximately 40 miles from the City of Anchorage.

11. The City of Cordova has a population of 1200 persons and is situated approximately 150 miles from the City of Anchorage.

12. The village of Tyonek has a population of approximately 195 persons and is situated approximately 50 miles from the City of Anchorage.

13. The City of Soldotna has a population of approximately 320 persons and is situated approximately 75 miles from the City of Anchorage.

fishermen and farmers, and all other stratifications of our society. He also stated that when the court sits in other communities of the district, such as Kodiak, Cordova and Seward, any required jurors are chosen from the area of the community in which the court is sitting at that time.

(2) Anna Mae Vokacek, clerk of the superior court for the Third District, stated that in her experience she had seen people of all races, including the native people of Alaska, and of all walks of life, summoned for jury duty in Anchorage.

(3) Agnes Jackson, a clerk in the Anchorage office of the Alaska Department of Fish and Game, stated that she found from a search of the records of the Alaska Department of Fish and Game that in 1964, 536 resident commercial fishing licenses were sold in the City of Anchorage. She stated that it was her experience in selling such licenses that the great majority of people purchasing them in the City of Anchorage listed residences in the Anchorage area.

(4) Wallace O. Craig, area field representative for the Bureau of Indian Affairs, United States Department of the Interior, stated that the Third District of the State of Alaska had a total population of approximately 12,634 native Indian, Aleut and Eskimos, and that his estimate of the number of such persons living in the greater Anchorage area was 2,350 as of December 31, 1964.

From an assessment of the affidavits filed by petitioner and the state, it is reasonably apparent that a majority of the native population, and a majority of the farmers, coal miners, homesteaders, oil field workers, and commercial fishermen in the Third District, are not subject to being summoned for jury duty in the City of Anchorage. This does not mean however, that there is not a substantial number of persons residing within the area selected who are of native blood or who do now or have in the past followed the occupation mentioned. It is not contended by petitioner that the exclusion of these persons from jury service is done intentionally for the purpose of discriminating against them or against any particular race or class. The question, then, that is presented is whether, regardless of purpose or intent, the failure to include the area of residence of certain persons or groups of persons for jury service is in violation of constitutional requirements and the concept of a jury system according to American tradition and democratic ideals.

Petitioner asserts that the failure to include the area of residence mentioned above denies him the equal protection of the laws. The United States Supreme Court has held that it is a denial of equal protection to try a defendant under an indictment issued by a grand jury from which persons of the defendant's class have been systematically excluded.[14] But that is not what occurred here. Petitioner makes no claim that there was a systematic exclusion from the grand jury that indicted him of a class of persons of which petitioner was a member. There has been no showing of a denial of equal protection of the laws.

Apart from any question involving equal protection, the United States Supreme Court has acted to curb what it has considered to be an undermining of and an injury to the jury system caused by the systematic exclusion from jury service of classes of persons that are eligible to serve as jurors. In Thiel v. Southern Pac. Co.,[15] a verdict of a jury in a federal district court was set aside where it was shown that

14. Eubanks v. Louisiana, 356 U.S. 584, 585–589, 78 S.Ct. 970, 2 L.Ed.2d 991, 993–995 (1958) ; Reece v. Georgia, 350 U.S. 85, 87, 76 S.Ct. 167, 100 L.Ed. 77, 81 (1955); Hernandez v. Texas, 347 U.S. 475, 477–482, 74 S.Ct. 667, 98 L.Ed.

866, 869–872 (1954); Annot., 2 L.Ed. 2d 2040 (1958).

15. 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946).

the clerk of the court and the jury commissioner had deliberately and intentionally excluded from jury service all persons who worked for a daily wage. The Supreme Court said:

> The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84, 86; Glasser v. United States, 315 U.S. 60, 85, 62 S.Ct. 457, 86 L.Ed. 680, 707. This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.
>
> \* \* \* \* \* \*
>
> It follows that we cannot sanction the method by which the jury panel was formed in this case. The trial court should have granted petitioner's motion to strike the panel. That conclusion requires us to reverse the judgment below in the exercise of our power of supervision over the administration of justice in the Federal courts. See McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed. 819, 823. On that basis it be-

comes unnecessary to determine whether the petitioner was in any way prejudiced by the wrongful exclusion or whether he was one of the excluded class. See Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, supra; Walter v. State, 208 Ind. 231, 195 N.E. 268, 98 A.L.R. 607; State ex rel. Passer v. County Board, 171 Minn. 177, 213 N.W. 545, 52 A.L.R. 916. It is likewise immaterial that the jury which actually decided the factual issue in the case was found to contain at least five members of the laboring class. The evil lies in the admitted wholesale exclusion of a large class of wage earners in disregard of the high standards of jury selection. To reassert those standards, to guard against the subtle undermining of the jury system, requires a new trial by a jury drawn from a panel properly and fairly chosen.[16]

In Ballard v. United States,[17] the Supreme Court ordered dismissal of an indictment that had been returned by a grand jury from which women had been intentionally and systematically excluded. The court stated:

> We conclude that the purposeful and systematic exclusion of women from the panel in this case was a departure from the scheme of jury selection which Congress adopted and that, as in the Thiel case, we should exercise our power of supervision over the administration of justice in the federal courts, McNabb v. United States (US) supra, (318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819), to correct an error which permeated this proceeding.
>
> \* \* \* \* \* \*
>
> [R]eversible error does not depend on a showing of prejudice in an individual case. The evil lies in the admitted exclusion of an eligible class or group in the community in disregard of the

16. Id., 328 U.S. at 220–225, 66 S.Ct. at 985–988, 90 L.Ed. at 1184–1187.

17. 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946).

prescribed standards of jury selection. The systematic and intentional exclusion of women, like the exclusion of a racial group, Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84, or an economic or social class, Thiel v. Southern P. Co., [328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, 166 A.L.R. 1412], supra, deprives the jury system of the broad base it was designed by Congress to have in our democratic society. It is a departure from the statutory scheme. As well stated in United States v. Roemig, D.C., 52 F.Supp. 857, 862, "Such action is operative to destroy the basic democracy and classlessness of jury personnel." It "does not accord to the defendant the type of jury to which the law entitles him. It is an administrative denial of a right which the lawmakers have not seen fit to withhold from, but have actually guaranteed to him." Cf. Kotteakos v. United States, 328 U.S. 750, 764, 765, 66 S.Ct. 1239, [90 L. Ed. 1557, 1566, 1567]. The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.[18]

 As the United States Supreme Court does with respect to the federal courts, we would exercise our power of supervision over the administration of justice in the state courts and order the indictment dismissed if it appeared that the grand jury had been selected in disregard of standards of jury selection reflected in our American tradition and democratic ideals of indictment and trial by jury. But we find nothing in the record in this case which calls for the exercise of such supervisory power. The policy of calling jurors only from an area within a fifteen mile radius of the City of Anchorage does not result in the exclusion from jury service of any particular and defined stratum of society so as to detract from the broad base that our jury system is designed to have.[19]

It may be true, as petitioner asserts, that the fifteen mile limitation encompasses only about one-half of one percent of the total land area in the Third Judicial District.[20] But that in itself does not signify a forbidden exclusion from jury service of any particular social, economic, racial, political, religious, or geographical group of persons, because within a radius of fifteen miles of the City of Anchorage is found approximately 70% of the entire population of the District.

It may also be true that in the towns and villages outside the Anchorage area there will be found a majority of Alaska's native population, and a majority of persons who depend for their livelihood upon commercial fishing, farming, coal mining, ranching, and oil field work. But some of each class of those persons reside within the Anchorage area and are eligible for jury service. Judge Davis stated that

> [T]he Anchorage area constitutes a very cosmopolitan community which includes most, if not all, of the racial, economic, occupational and religious groups found in the Third Judicial District of Alaska.

18. Id. at 193–195, 67 S.Ct. at 264–265, 91 L.Ed. at 185–187.

19. We also reject petitioner's contention that equality demands uniformity of rules and there can be no constitutional uniformity if each jurisdictional district in Alaska is allowed to promulgate its own rules and regulations as to the impaneling of grand and petit jurors. Contrary to petitioner's assertion, the provisions of AS 09.20.050–09.20.070 permit each district to determine for itself questions pertaining to the selection of grand and petit jurors. We are of the opinion that this statutory grant is reasonable in light of the significant differences, in such factors as population, location, weather, modes of transportation, and climate, between the four judicial districts of this state.

20. The total geographical land area of the Third District, according to petitioner's computation, is 138,985 square miles.

And Judge Moody, who ruled on the matter below and is presently the presiding judge for the Third District, stated:

There is no serious contention by the defendant that all the groups indicated —indicated in his motion, geographical, economic, races and classes, that there are some not within the fifteen mile area designated by the Presiding Judge, although it is conceded that maybe a greater number proportionately would be located outside of the fifteen mile area.

I find that there's been no showing that any of the groups claimed by the defendant to have been excluded totally were, in fact, totally excluded since, as indicated by the State, it is common knowledge and this Court having sat on a large number of jury cases, in approximately three years, can attest to the fact that all of these groups referred to by the defendant have at one time or another either sat on a jury or have been called for jury duty although they may have been excused or challenged.

We do not require, in order to maintain the broad base that our jury system is designed to have, that there be equal representation on juries of every economic, social, religious, racial, political and geographical group of the entire judicial district.[21] To require that would involve a tremendous cost to the state, because of the vastness of the Third District and the remoteness of many towns and villages, many of which are accessible only by air on an unscheduled basis and at limited times depending upon weather conditions. We believe such costs to be unnecessary within the meaning of AS 09.20.070.

Based upon the record as it pertains to the geography of the Third District and the people who reside there, we are of the opinion that those persons residing in that portion of the Third District comprising the City of Anchorage and an area within a fifteen mile radius of the city represent a fair cross-section of the different economic, social, religious, racial, political and geographical groups found in the Third District. A grand jury selected from the Anchorage area is a jury which satisfies proper standards of jury selection.[22]

Petitioner's final point is that one of the members of the grand jury which indicted him was not legally qualified to serve as a grand juror, and therefore petitioner's constitutional right to be indicted by due process of law was violated.

■ AS 12.40.010 provides that grand jurors shall have the qualifications and be drawn as are trial jurors in civil actions.[23] One of the grand jurors in this case, Julia Simonson, was not selected to serve on the grand jury in the manner provided by law, i. e., at a public drawing. Instead, by court order she was transferred to the grand jury from the petit jury where she initially had been chosen to serve.

Criminal Rule 6(a) permits a qualified member of the grand jury panel not designated to serve as a member of the grand jury to be placed on the petit jury panel. The rule does not provide, however, for the placement on the grand jury panel of a qualified member of the petit jury panel not designated to serve as a petit juror. Julia Simonson was not selected according to law and therefore not legally qualified to serve as a grand juror.

■ This does not mean, however, that the indictment was invalidated and was subject to dismissal. In accordance with Crimi-

---

21. See Bary v. United States, 248 F.2d 201, 206 (10th Cir. 1957); United States v. Gottfried, 165 F.2d 360, 364 (2d Cir.), cert. denied, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948).

22. Yoho v. United States, 202 F.2d 241, 14 Alaska 174 (9th Cir. 1953).

23. AS 12.40.010 reads:
Grand jurors shall have the qualifications and be drawn as are trial jurors under AS 09.20.010–09.20.080.

nal Rule 6(d)[24] the trial judge ordered that the record of the number of grand jurors concurring in the finding of the indictment against petitioner be made public. Such records show that the vote on the indictment was unanimous—all fifteen of the grand jurors voting in favor of the indictment. The superior court was therefore correct in holding that the indictment was valid and not subject to dismissal, since the records show that a majority of the total number of grand jurors, after deducting the one not qualified, had concurred in finding the indictment.[25]

The order denying petitioner's motion to dismiss the indictment is affirmed.

24. Crim.R. 6(d) provides:
*Foreman and Deputy Foreman.* The presiding judge shall appoint one of the jurors to be foreman and another to be deputy foreman. The foreman shall have power to administer oaths and affirmations and shall endorse all indictments. He or another juror designated by him shall keep a record of the number of jurors concurring in the finding of every indictment and shall file the record with the clerk of the court, but the record shall not be made public except on order of the presiding judge. During the absence of the foreman, the deputy foreman shall act as foreman.

25. Crim.R. 6(c) (2) provides:
*Motion to Dismiss.* A motion to dismiss the indictment may be based upon objections to the array or the lack of legal qualification of an individual juror, if not previously determined upon challenge. An indictment shall not be dismissed upon the ground that one or more members of the grand jury were not legally qualified if it appears from the record kept pursuant to subdivision (d) of this rule that a majority of the total number of grand jurors, after deducting the number not legally qualified, concurred in finding the indictment.