Paul S. PETERSON, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. 2642.

Supreme Court of Alaska.

April 20, 1977.

Brian Shortell, Public Defender, Phillip P. Weidner, Barbara J. Miracle and John M. Murtagh, Asst. Public Defenders, Anchorage, for appellant.

Avrum M. Gross, Atty. Gen., Juneau, Joseph D. Balfe, Dist. Atty., and Ivan Lawner, Asst. Dist. Atty., Anchorage, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

## OPINION

ERWIN, Justice.

On December 22, 1974, four persons were killed in a cabin in the village of Chignik Lagoon. The following day appellant Paul Stanley Peterson, Jr., the son of Helen and Paul Peterson, two of the victims, was arrested after he confessed to having killed his parents, Nick Willie, and Peter Phillips. Peterson appeals from his conviction on four counts of second degree murder.

Although appellant asserts six contentions of error by the trial court, his primary claims are that the trial court erred in refusing to dismiss the charges against him for violation of his speedy trial rights and

that the trial court erred in denying his motion to suppress the statements he made to law enforcement officers. We will address appellant's contentions of error after a statement of the facts.

On December 23, 1974, Sergeant Robert Lochman of the Alaska State Troopers received a report from the Coast Guard that there had been a shooting incident at Chignik Lagoon. Two persons were reported to be dead and two more to be seriously injured; an armed suspect was reportedly at large. Lochman and Trooper Corporal James W. Hogan flew to Chignik Lagoon from Anchorage that same day. Since bad weather made it less than certain that they would be able to get to Chignik Lagoon, Lochman ordered Corporal Joseph Brantley of the Fish and Wildlife Protection Division of the Department of Public Safety to fly himself and Trooper Phillip Gilson to the scene from King Salmon. He also ordered a trooper to fly in from Dillingham and another from Sand Point. When all of the troopers made it to the scene, Lochman decided that there was no need for him to remain there for the investigation, so he left for Kodiak after two hours at Chignik Lagoon, leaving Corporal Hogan in charge of the investigation.

Lochman and Hogan had landed in Chignik Logoon right at the cabin in which the killings occurred. Since their report from the Coast Guard had indicated that an armed suspect was at large, they first went through all of the buildings to see if anyone was around. When Lochman finally entered the cabin, he found Paul Peterson, Sr., Helen Peterson, Peter Phillips and Nick Willie. All four were dead. Nick Willie's body was on the floor of the cabin, and there was a shotgun laying across his chest. It appeared to Lochman that the gun had been placed on Willie's body after the shooting. All four had been shot in the head, and all of their wounds appeared to be shotgun wounds. The condition of the bodies indicated to Lochman that the deaths had not just taken place, but also that the deaths had occurred no more than three days before. There was nothing at the scene which indicated to Lochman that any substantial amount of time had passed between the deaths of the four.

Corporal Brantley arrived at Chignik Lagoon with Trooper Gilson and Don Cogger of the Fish and Wildlife division in the afternoon of December 23. They landed near the Chignik Lagoon cannery, and Brantley went directly to the cannery. He did not go to the cabin where the killings occurred. At the cannery Brantley met Mrs. Jack Dodge, who lived in the cannery complex with her husband. Mrs. Dodge introduced Brantley to appellant Peterson, who had come to the cannery that morning to tell the Dodges that his parents had been killed.

Brantley interviewed Peterson at this point to "determine what he had seen and what he knew and if there was, in fact, someone hiding in the brush." Brantley transcribed verbatim a statement made by Peterson, and Peterson signed the statement. The time was 3:25 p. m. on December 23. Brantley testified that Peterson was not in custody and was not suspected of having committed any crime at this point. Peterson was not advised of his rights before he made his first statement.

Peterson's first statement to Brantley related that Peterson had arisen on the morning of December 23 and, finding that his parents had not returned home, gone to Nick Willie's cabin to look for them. There he discovered his father's body. Without checking to see whether his mother was dead or alive, he ran off to tell the Dodges that his father was dead. He did notice, however, that his father's shotgun was laying across Nick Willie's stomach.

After the first interview, Peterson remained in the cannery area. Brantley testified that nothing in Peterson's first interview aroused any suspicion that Peterson had committed any crime. According to Brantley, Peterson moved about the cannery area freely and did not stay with Brantley at all times.

When Officer Cogger returned from the Willie cabin, he told Brantley that it ap-

peared that someone had attempted to make a series of homicides look like a homicide-suicide. He also reported that there were no tracks to indicate that someone had run off into the brush to hide. Brantley then began to suspect that Peterson knew more about the killings than he had revealed in his earlier interview. Brantley testified that he conducted a second interview with Peterson at this point to get as many details as possible to compare with the evidence. The time was 5 or 6 o'clock in the evening, and the interview took place in the cannery store.

Brantley began the interview by advising Peterson of his "rights to an attorney, not to make any statements, [to] have your attorney present and to stop answering questions at any time and to have your attorney present with you during the interview." Brantley admitted that he did not read the *Miranda* warning from a card. Peterson was not told that his statements could and would be used against him, nor was he told that an attorney would be appointed for him if he desired counsel and could not afford to retain an attorney. Peterson stated that he understood his rights.

When Brantley asked Peterson to "tell us what you know about this situation involving your father and mother and Willie and Phillips," Peterson responded with "I wouldn't like to talk about it. They gone now. They're dead." Brantley then said:

I understand that—I can understand your feelings, but what we're trying to do is get to the bottom of why they're dead and perhaps you can help us with that. Peterson responded, "I don't know why they're dead—I just found them like that." The questioning continued, but Peterson's second interview only produced a more detailed version of his earlier story.

Shortly after the second interview Trooper Gilson returned to the cannery area from the Willie cabin. He interviewed Peterson in the cannery store at about 7:00. After this interview Gilson arrested Peterson.

Gilson testified that he felt that he did not have probable cause to arrest Peterson before this interview. He admitted that he did not have other suspects, but he stated that he was still open to other suggestions until he talked to Peterson. However, Paul Peterson was "a prime suspect" at the time of the 7 o'clock interview.

Gilson's first interview of Peterson was not taped. Gilson testified that he advised Peterson of his rights, reading from a card in the same manner as he did the following morning when he conducted a second, taped interview.[1] Gilson also testified that Peterson's response on the evening of December 23 to the reading of his rights was essentially the same as it was on the morning of December 24, at which time Peterson responded "Yes, I do" to the question of whether he understood his rights.

At 9:35 a. m. on December 24, 1974, Trooper Gilson obtained a full confession from Paul S. Peterson, Jr. The interview began with a clear, slow reading of Peterson's rights.[2] Gilson testified that Peterson

---

1. The statement of his rights given to Peterson by Trooper Gilson on the morning of December 24 was as follows:

    GILSON: Paul, I'm gonna first advise you of your rights and listen very closely to me. If you have any questions, we'll discuss your rights—and I want to make sure that you thoroughly understand your rights. Okay?
    PETERSON: Okay.
    GILSON: Okay. Number one—you have the right to remain silent. [Pause.] Number two—anything you say can be used against you in a court of law. [Pause.] Number three—you have the right to talk to a lawyer before answering any questions and you may have him present with you while you are being questioned. [Pause.] Number four—if you cannot afford to hire a lawyer and you

wish one, one will be appointed to represent you before any questioning and at no expense to you. Number five—if you do give a statement, you can stop talking at any time you wish. Now do you understand these rights, Paul, that I have just explained to you?
    PETERSON: Yes, I do.
    GILSON: Okay. Having these rights in mind, will you talk to me now about the incident in question?
    PETERSON: Yes I will.
    GILSON: Okay, Paul, you realize that this is being recorded, and you have no objection to that?
    PETERSON: No.

2. See note 1, *supra*.

did not appear to be under the influence of any intoxicating beverage, that he was responsive to Gilson's questions, that he indicated understanding of his rights, and that he did not appear reluctant to talk to Gilson. However, Peterson was extremely soft-spoken throughout the December 24 interview.

Peterson explained that he had been at Nick Willie's cabin on the night of December 22 with his parents, Willie and Peter Phillips. They had all been drinking home brew. Peterson and Willie got into a heated argument. Peterson shot Willie in the head with his father's shotgun and then killed the other three so that there would be no witnesses. He went home to the Peterson cabin, taking the shotgun with him. He returned the same evening to put the gun on top of Willie in order to make the scene look like a murder-suicide. He then went back to his own cabin again. The next morning he returned to the Willie cabin one more time to survey the scene, and then he went to the cannery to tell the Dodges that his parents were dead.

As the December 24 interview progressed, Peterson began to sob. Gilson's final questions caused Peterson to break into a whimpering crying:

> GILSON: Paul, I'm sure you've searched your own—your own soul. Do you know why—why you did the shooting, Paul?
> PETERSON: No. I don't know why.
> GILSON: You don't know if it was the result of an argument?

PETERSON: No I don't. I don't know why I did it. I can't—I can't—I don't know why I did that to them. (Crying). GILSON: All right, Paul. I think probably we'll stop—stop the interview now. All right? I'll see if we can get you a cup of coffee.

On the instruction of Sergeant Lochman, Peterson had been arrested for only one of the homicides, that of his father, Paul S. Peterson, Sr. This was done because Lochman had been concerned that the bad weather around Chignik Lagoon might make it impossible for his men to get Peterson before a judge or magistrate within the 24-hour period required by Criminal Rule 5(a)(1) for a defendant's initial appearance. While Corporal Hogan was transporting Peterson to Kodiak, Sergeant Lochman drafted a complaint charging Peterson with first degree murder of his father. Peterson appeared before District Court Judge Virgil Vochoska in Kodiak some time between 10:30 and midnight on December 24. Judge Vochoska set bail, appointed the public defender to represent Peterson, and set December 31 as a tentative date for a preliminary hearing.

On December 26 or 27, Samuel Barnard of the Alaska State Troopers interviewed Peterson the fifth time. The questioning took place at the Kodiak City police station. Barnard fully advised Peterson of his rights.[3] When Peterson asked Barnard what "waiver" meant, Barnard said, "Number one, that you understand your rights. Number two, that you want to talk to us.

---

3. The statement of his rights given to Peterson by Barnard was as follows:

> BARNARD: I'll read the rights to you off this form and you can read it yourself in case there's any questions. Before we ask you any questions, you might [sic] understand your rights. "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questions, if you wish. You can decide at any time to exercise these rights, not answer any questions or make any statements."

> In other words, if I'm talking to you and you decide you don't want to talk any more, you have that right to do so, you just tell me if you want to stop. O.K.? Now that the waiver of the rights are: "I read this statement of my rights, I understand what my rights are, I am going to make a statement as you question me. If I do not want a lawyer at this time. [Sic] I understand I know what I am doing, no promises or threats have been made to me and no pressure or coercion of any kind have been used against me." In other words, we are not forcing you to talk. O.K.? Do you understand that pretty well? PETERSON: I understand that.

But it also means that at any time you can stop answering questions." Peterson then indicated that he understood this and repeated the story that he had told Trooper Gilson on December 24, adding some details.

On December 27, Assistant Public Defender Chris J. Rigos signed a waiver of preliminary hearing within ten days, purportedly on behalf of Peterson. The waiver was expressly conditioned on the understanding that a preliminary hearing would be held during the week of January 6, 1975.

On December 31, 1974, the date originally set for preliminary hearing, Peterson appeared before Judge Vochoska without counsel. Judge Vochoska explained to Peterson that the public defender had requested that the preliminary hearing be set over to the week of January 6. The defendant indicated that he had no objection to this. The court then set the hearing for January 6 or 7, 1975. On January 7, District Court Magistrate Brigitte S. McBride reset the preliminary hearing for January 13, 1975. No explanation for this delay is apparent from the record.

On January 9, 1975, Peterson was indicted for the first degree murder of Nick Willie, Peter Phillips, Helen Peterson and Paul Peterson, Sr. The defendant was purportedly arraigned on the indictment by District Court Judge Warren Tucker in Anchorage on January 19, 1975. However, Peterson was without counsel at this appearance. No further court action was taken until May 2, 1975.

On May 2, 1975, Assistant District Attorney J. Randall Luffberry appeared before Superior Court Judge Eben H. Lewis in Kodiak and requested a prompt trial setting because of speedy trial problems with the case. The prosecutor indicated that he had been under the impression for several months that Peterson was going to be undergoing a psychiatric evaluation. However, no request for a psychiatric evaluation or any other motions had been filed by either side. Neither the defendant nor his counsel was present at the trial setting on May 2. Nevertheless, Judge Lewis set trial for May 8, 1975, less than a week away.

On May 7, 1975, the case was formally assigned by Presiding Judge C. J. Occhipinti to Judge Eben H. Lewis and set for trial in Kodiak on May 8, 1975. Judge Occhipinti also ordered that if Judge Lewis were to be peremptorily disqualified, the case would be immediately reassigned to Judge Ralph E. Moody.

On May 8, 1975, Peterson attempted to challenge Judge Lewis for cause pursuant to AS 22.20.020. Judge Peter J. Kalamarides denied the disqualification for cause. The defendant then moved to peremptorily disqualify Judge Lewis under AS 22.20.022. Judge Lewis recognized the peremptory challenge and took no further action in the case.

Pursuant to Judge Occhipinti's order of May 7, Judge Moody immediately took over the case. The defendant moved to challenge Judge Moody for cause. Judge Seaborn J. Buckalew heard counsel on the disqualification motion over the telephone, as Judge Kalamarides had, and denied the challenge of Judge Moody for cause. The defense then moved to challenge Judge Moody peremptorily on behalf of defense counsel. Judge Moody denied the peremptory challenge on the ground that the defendant had already exercised a peremptory challenge as to Judge Lewis.

The defendant then moved to dismiss the indictment for failure to comply with the 120-day rule provided in Criminal Rule 45. Judge Moody ruled that both the prosecutor and defense counsel have a duty under Rule 45 "to get the case to trial" and that both the public defender and the district attorney had been dilatory in this case. Judge Moody ruled further that a 15 to 20 day violation of Criminal Rule 45 did not warrant dismissal of charges against an alleged quadruple murderer. However, he granted Assistant Public Defender Olof Hellen a stay so that Hellen could seek review by this court of the denial of Peterson's motion to dismiss for failure to comply with Rule 45. This court denied Peterson's motion for stay, but suggested that the trial court make certain factual determinations apart from the trial.

In the proceeding suggested by this court, Judge Moody found that the first three counts of the indictment arose out of the same conduct as that alleged in Count IV (i. e., the murder of Paul Peterson, Sr.) and that all four crimes occurred at approximately the same time and place and under the same circumstances. He also found that the evidence on all four counts was equally available when the defendant was charged with the killing of his father.

On June 25, 1975, Judge Moody denied defense motions to dismiss the indictment for improprieties in the grand jury and for failure to state an offense. Judge Moody also denied a motion to dismiss for pretrial and pre-arraignment delay. He held that the public defender had not been ready to go to trial on May 8 and that as of that date defense counsel had waived the 120-day rule by not being ready for trial.

The court found that there was nothing to indicate from the testimony as a whole that the defendant was unable to comprehend his Miranda rights. The court found that the defendant did understand the warnings and nevertheless gave statements to the police. Therefore, defendant's motion to suppress was denied.

Following the denial of these motions, Peterson entered pleas of nolo contendere to four counts of second degree murder, reserving his right to appeal on the motions. On July 24, 1975, Peterson was sentenced to 20 years on each count, to be served concurrently.

■ Appellant Peterson asserts five errors which we will consider on appeal.[4] These will be discussed in turn.

I. Did the trial court err in refusing to dismiss for failure to comply with Criminal Rule 45?

Appellant asserts that the State's failure to bring him to trial within the 120-day period mandated by Criminal Rule 45(b) necessitates dismissal with prejudice of the charges against him as provided by Rule 45(g). Peterson was arrested on December 23, 1974. A complaint for one count of first degree murder was filed against him on December 24, 1974. On January 9, 1975, an indictment charging four counts of first degree murder was filed against him. On May 2, 1975, an ex parte trial setting was held. On May 8, 1975, trial was scheduled to commence. May 8, 1975, was 136 days after Peterson's arrest.

Criminal Rule 45 provides in pertinent part:

(b) *Speedy Trial Time Limits.* A defendant charged with either a felony or a misdemeanor shall be tried within 120 days from the time set forth in section (c).

(c) *When Time Commences to Run.* The time for trial shall begin running, without demand by the defendant, as follows:

(1) From the date the defendant is arrested, initially arraigned, or from the date the charge (complaint, indictment, or information) is served upon the defendant, whichever is first. The arrest, arraignment, or service upon the defendant of a complaint, indictment, or information, relating to subsequent charges arising out of the same conduct, or the refiling of the original charge, shall not extend the time, unless the evidence on which the new charge is based was not

---

4. Appellant also attempts to raise a sixth contention of error. He attempts to challenge the practice of selecting petit jurors for trials held in Kodiak solely from the residents of Kodiak. Relying on *Alvarado v. State*, 486 P.2d 891 (Alaska 1971), appellant asserts that he was entitled to a jury panel drawn from the entire judicial district or from the entire senate district which contains Chignik Lagoon, or alternatively, that he was entitled to venue in Chignik Lagoon.

Since appellant plead nolo contendere and did not go to trial, we find this issue to be moot. Though the issue is one of public concern, it is likely to recur in a context readily capable of review. See *Gieffels v. State*, 552 P.2d 661, 665 (Alaska 1976).

available to the prosecution at the time the defendant was either initially arrested, arraigned, or served with the original charge, and a showing of due diligence in securing defendant for the original charges is made by the prosecution;

.    .    .    .    .

(g) *Absolute Discharge.* If a defendant is not brought to trial before the running of the time for trial, as extended by excluded periods, the court upon motion of the defendant shall dismiss the charge with prejudice. Such discharge bars prosecution for the offense charged and for any other lesser included offense within the offense charged.

Appellant Peterson claims that Rule 45(g) requires dismissal with prejudice of the charges against him. In response the State argues that the Rule 45 period had not run as to Counts I, II and III of the indictment and that Rule 45 should be relaxed in this case in the interest of justice.

The State argues that the Rule 45 period did not commence to run on Counts I–III of the indictment (charging the murder of Nick Willie, Peter Phillips and Helen Peterson) until January 9, 1975, when the indictment was returned. The State maintains that the period commenced running on the date of Peterson's arrest, December 23, 1974, only as to the murder of his father, Paul S. Peterson, Sr.

Rule 45 provides that indictment on charges arising out of the same conduct as that which gave rise to charges on which the Rule 45 period is already running shall not extend the time during which an accused must be brought to trial. An exception is made for later filed charges arising out of the same conduct if

the evidence on which the new charge is based was not available to the prosecution at the time the defendant was either initially arrested, arraigned, or served with the original charge, and a showing of due diligence in securing defendant for the original charges is made by the prosecution. . . .[5]

The trial court specifically found that the first three counts of the indictment arose out of the same conduct as that alleged in Count IV (i. e., the murder of Paul S. Peterson, Sr.) and that the evidence on all four counts was available when the defendant was charged with the killing of his father. The State does not argue that the evidence concerning Counts I–III was less available than that concerning Count IV at the time the complaint for the murder of Paul Peterson, Sr., was filed. The State does contend, however, that the trial court's findings are based on an erroneous reading of the "same conduct" language in Rule 45.

The State's argument is based on a comparison of Criminal Rule 45 with the American Bar Association's Standards Relating to Speedy Trial (hereinafter referred to as ABA Standards). Rule 45 was derived from the ABA Standards.[6] However, the drafters of Rule 45 altered the ABA proposed speedy trial rules somewhat.

Rule 45 provides that the later filing of charges "arising out of the same conduct" as that which gave rise to the original charge will not extend the speedy trial period unless the unavailable evidence test is met. ABA Standard 2.2(a) provides that no extension will be given for later filed charges "based on the same conduct or arising from the same criminal episode."[7]

The commentary to the ABA Standards differentiates between charges "based on

---

**5.** Rule 45(c)(1).

**6.** See *Peterkin v. State*, 543 P.2d 418 (Alaska 1975).

**7.** ABA Standard 2.2(a) provides:
   2.2  When time commences to run.
    The time for trial should commence running, without demand by the defendant, as follows:

(a) from the date the charge is filed, except that if the defendant has been continuously held in custody or on bail or recognizance until that date to answer for the same crime or a crime based on the same conduct or arising from the same criminal episode, then the time for trial should commence running from the date he was held to answer;

the same conduct" and charges "arising from the same criminal episode" as follows:

> The word "conduct" is usually taken to mean an act or omission, and thus covers those cases where several offenses arise out of the same act, as where a defendant recklessly operates an automobile and kills two persons. "Episode" means "an occurrence or connected series of occurrences and developments which may be viewed as distinctive and apart although part of a larger and more comprehensive series." WEBSTER, THIRD NEW INTERNATIONAL DICTIONARY 765 (1961). This would cover the killing of several people with successive shots from a gun, e. g., People v. Ciucci, 8 Ill.2d 619, 137 N.E.2d 40 (1956). . . .[8]

From this commentary and particularly from the Ciucci case cited therein, the State concludes that deletion of the "same criminal episode" language from Rule 45 was meant to allow extension of the speedy trial period by later filing of charges based on the same criminal episode, whereas later filing of charges based on the same conduct would not extend the period. According to Ciucci, the State argues, charges of killing people other than those named in the original charge are charges based on the same criminal episode as long as successive gunshots were used, even though the killings occurred at the same time and under the same circumstances. Thus the later filing against appellant Peterson of charges of murdering his mother, Willie, and Phillips should extend the speedy trial period as to those charges.

■ While the deletion of the "same criminal episode" language from the ABA proposal does make Rule 45 susceptible to the interpretation advanced by the State, we reject that interpretation as inconsistent with the policies behind Rule 45.[9] Rule 45 was promulgated to insure protection of the constitutional right to a speedy trial and to advance the public interest in swift justice.[10] Moreover, Rule 45(c)(1) indicates that the drafters of Rule 45 intended that charges based on the same evidence should be filed at the same time. To allow the State an extension on the speedy trial period simply because the four killings were caused by four shots rather than by one automobile accident would defeat the policies behind Rule 45.[11] Therefore we hold that the later filing of charges based on the same criminal episode does not extend the speedy trial period under Rule 45 unless the evidence on which the new charges are based was not available at the time of the original filing.

■ The trial court expressly found that evidence of all four counts was available on December 23, 1974, when defendant was arrested. Therefore we affirm the trial court's conclusion that the Rule 45 period commenced running on all four counts on December 23, 1974.

■ The trial court also found that over 120 days had passed between commencement of the Rule 45 period on December 23, 1974, and the scheduled trial date of May 8, 1975. The court made no specific findings that any periods between those times were subject to exclusion under Rule 45(d).[12] Nevertheless, the court denied Pe-

8. ABA Standards at 20.

9. The Ciucci case and the Alaska cases cited by the State, Thessen v. State, 508 P.2d 1192 (Alaska 1973), and Davenport v. State, 543 P.2d 1204 (Alaska 1975), are all double jeopardy cases. The concerns behind the double jeopardy rule are different than those behind speedy trial rules.

10. Peterkin v. State, 543 P.2d 418 (Alaska 1975).

11. The State has offered no explanation for the decision to initially charge only one murder except the testimony of Sergeant Lochman:

SERGEANT LOCHMAN: The reason we did is because the weather was terrible. We—it was very marginal leaving it in there and it was doubtful if we were going to get out. If we arrested him on all 4 counts, it could have easily been 3 or 4 days before we could get the guy arraigned so I told them to arrest him on one count on probable cause to get out of there.

12. Rule 45(d) provides in pertinent part:

(d) Excluded Periods. The following periods shall be excluded in computing the time for trial:

(1) The period of delay resulting from other proceedings concerning the defendant, in-

terson's motion to dismiss pursuant to Rule 45(g) because Peterson's attorney had been "dilatory" in carrying out a duty which the court ruled defense counsel was under. That duty, as the court saw it, was "to get the case for trial within the 4-month period." As an alternative basis for his denial of the Rule 45(g) motion, Judge Moody ruled that the public interest in trial of an alleged quadruple murderer outweighed what Judge Moody calculated to be a 15-day violation of Peterson's Rule 45 right.[13]

■ It is clear, however, that Judge Moody incorrectly interpreted the role of defense counsel under Rule 45. In *Peterkin v. State*, 543 P.2d 418 (Alaska 1975), the identical issue was presented and decided by this court. In that case

> cluding but not limited to motions to dismiss or suppress, examinations and hearings on competency, the period during which the defendant is incompetent to stand trial, interlocutory appeals, and trial of other charges. No pre-trial motion shall be held under advisement for more than 30 days and any time longer than 30 days shall not be considered as an excluded period.
>
> (2) The period of delay resulting from an adjournment or continuance granted at the timely request or with the consent of the defendant and his counsel. The court shall grant such a continuance only if it is satisfied that the postponement is in the interest of justice, taking into account the public interest in the prompt disposition of criminal offenses. A defendant without counsel shall not be deemed to have consented to a continuance unless he has been advised by the court of his right to a speedy trial under this rule and of the effect of his consent.
>
> (3) The period of delay resulting from a continuance granted at the timely request of the prosecution, if:
>
> (a) The continuance is granted because of the unavailability of evidence material to the state's case, when the prosecuting attorney has exercised due diligence to obtain such evidence and there are reasonable grounds to believe that such evidence will be available at the later date; or
>
> (b) The continuance is granted to allow the prosecuting attorney in a felony case additional time to prepare the state's case and additional time is justified because of the exceptional complexity of the particular case.
>
> .    .    .    .    .
>
> (7) Other periods of delay for good cause.

the actual reason for the trial judge's refusal to dismiss the case was his firm conviction that defense counsel and the prosecution share an equal obligation to . . . expeditiously demand a speedy trial. . . .[14]

We clearly rejected the trial judge's view in *Peterkin*:

> [W]e feel it is too much to expect of human nature that a defendant must demand a speedy trial . . . under our system of criminal justice, it is the prosecution which initiates a case and which has the power of going forward with it. . . . We, therefore, reaffirm . . . that the burden is upon the state to give a speedy trial or be denied the power to prosecute.[15]

**13.** Our calculation is somewhat different. We conclude that the day of arrest is to be excluded, but the day trial commences is to be included in calculating the Rule 45 period. See *Nickels v. State*, 545 P.2d 163, 165 (Alaska 1976). Thus, we conclude that 136 days had elapsed between the date of Peterson's arrest (December 23, 1974) and the date his trial commenced (May 8, 1975).

Further we conclude that 10 of the 136 days were subject to exclusion under Rule 45(d)(2). See note 12, *supra*. Peterson's waiver of the 10-day rule for preliminary hearing provided by Criminal Rule 5(e)(2) was based on an express understanding that his preliminary hearing would only be postponed from December 31, 1974, to the week of January 6, 1975. This would have moved the hearing to no later than January 10, 1975. This represents a 10-day delay attributable to the defendant and is subject to exclusion.

Finally we conclude that no other periods between the time of arrest and the time trial commenced were subject to exclusion in this case. The State has conceded that it can find no excluded periods and that it was dilatory in prosecuting this case. The State has abandoned any claim that the Public Defender Agency misled the State concerning pending psychiatric evaluations. The attorney who prosecuted the case has conceded that any belief he had on this point was his mistake. Based on the foregoing, we conclude that 126 nonexcluded days elapsed between arrest and trial in this case.

**14.** 543 P.2d at 422.

**15.** *Id.*, quoting *Rutherford v. State*, 486 P.2d 946, 950 (Alaska 1971) (footnote omitted).

Thus Judge Moody erred in ruling that defense counsel had a duty to demand trial. We must therefore decide whether the second ground for his denial of Peterson's Rule 45(g) motion was proper. Judge Moody ruled that the public interest in trial of an alleged quadruple murderer outweighed what he calculated to be a 15-day violation of Peterson's Rule 45 right.[16] While the basis of Judge Moody's decision to ignore the explicit direction of Rule 45(g) was not clearly articulated by him, the parties have appropriately treated this as a decision to apply the discretion granted the trial judge under Criminal Rule 53.

Criminal Rule 53 provides:

These rules are designed to facilitate business and advance justice. They may be relaxed or dispensed with by the court in any case where it shall be manifest to the court that a strict adherence to them will work injustice.

In *Peterkin*[17] we recognized that Rule 53 can be applied to excuse certain types of noncompliance with Rule 45. However, we did not find the violation presented in *Peterkin* to be one which would be excused even if Rule 53 was applied.

The State seeks to distinguish this case from *Peterkin*. First, the State notes that in *Peterkin* over a year had elapsed between the date of the offense and the motion to dismiss. In this case trial was scheduled for 136 days after defendant's arrest.

Second, the State argues that Peterkin's defenses, self-defense or defense of a third person, were particularly dependent on the memories of witnesses, whereas Peterson's defenses, intoxication or insanity, were not particularly dependent on the memories of witnesses. Therefore, the State argues, the rationale behind Rule 45 is less applicable to this case than it was to *Peterkin*. The State contends that the trial judge did not abuse his discretion under Rule 53 by permitting trial in this case because the de-

fendant's speedy trial right was not significantly prejudiced by the delay and because any prejudice that there may have been to the defendant was outweighed by the public's interest in trial of the extremely serious crimes allegedly committed. We agree.

■ We conclude that the trial judge did not abuse the discretion granted to him under Rule 53 by relaxing Rule 45 in this case. We hold that four factors combine to make this case a rare exception to the mandate of Rule 45: (1) the severity of the crimes alleged, (2) the lack of any identifiable prejudice to the appellant due to the delay, (3) the extremely short period of delay beyond 120 days,[18] and (4) the unique difficulty of investigating crimes in bush areas.

■ We caution bench and bar, however, that the result we reach here is not to be taken as an indication that Rule 45 can often be properly relaxed. Although every criminal case has unique features, few cases will be sufficiently unusual to justify relaxation of Rule 45. We view each of the four factors listed which are present in this case to be an integral part of our decision that relaxation of Rule 45 was appropriate in this case. Only a very small number of cases can be considered so unusual that relaxation of Rule 45, which is designed to protect the rights of the defendant and to advance the interest of society in swift justice,[19] would be justified.

## II. Did the trial court err in denying appellant's Motion to Suppress?

Appellant argues that the trial court erred in refusing to suppress the statements given by him during his five interviews with law enforcement officials. First he contends that his statements should have been suppressed because he was not given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Second, he argues that even if adequate warnings were given, his statements should have been suppressed because

---

**16.** See note 13, *supra.*

**17.** 543 P.2d at 424.

**18.** See note 13, *supra.*

**19.** *Peterkin v. State,* 543 P.2d 418 (Alaska 1975).

the State failed to carry its "heavy burden . . . to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." [20]

In *Miranda* the United States Supreme Court prescribed a series of warnings which must be given before law enforcement officers can question one accused of criminal conduct. The accused must be warned:

that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. [21]

If the warnings are not given when required, statements made by the accused in response to the interrogation cannot over the accused's objection be admitted in evidence against him at trial. [22] At issue here is when such warnings are required and if they were required at a point earlier than when they were given in this case.

The record reveals that Officer Brantley did not advise Peterson of any of his *Miranda* rights before the first interview. He did advise Peterson of some of his rights before the second interview, but he failed to advise Peterson that any statements he made could be used against him and that counsel would be appointed for him before questioning if he so desired and was eligible. If *Miranda* warnings were required at either of these interviews, Brantley clearly failed to give adequate warnings, and the statements produced should have been suppressed.

Trooper Gilson testified that he gave Peterson the same warnings before the third interview as he gave before the fourth interview. Appellant did not dispute this at trial or before this court. Therefore, we will assume that the warnings given before the third interview were identical to those given before the fourth interview, and we will assess the validity of the warnings before the third interview on the basis of those given at the fourth interview.

■ At the fourth interview Trooper Gilson slowly and clearly read Peterson his *Miranda* rights. [23] Appellant claims that the warning was inadequate because of Gilson's failure to warn Peterson that his statements "can *and will* be used" against him. In *Schade v. State*, 512 P.2d 907, 914 (Alaska 1973), this court held that

. . . statements of the accused, stemming from custodial interrogation, are not admissible in evidence unless a proper warning has been given before interrogation has commenced. The warning must clearly apprise the accused (1) that he has the right to remain silent, (2) that any statements he makes may be used against him, (3) that he has the right to consult with a lawyer and to have the lawyer with him during interrogation, and (4) that if he is indigent he is entitled to have a lawyer appointed for him prior to any interrogation.

No mention is made of any requirement that law enforcement officers inform a defendant that statements he makes *will* be used against him. We hold that the warnings given before the third and fourth interviews adequately complied with *Miranda* and *Schade*. Those given to Peterson by Trooper Barnard before the fifth interview also met the requirements of *Miranda*. [24]

■ The *Miranda* decision clearly requires law enforcement officers to give the prescribed warnings before interrogating all suspects who are in custody. [25] Paul Peterson was not under arrest until after he gave his third statement. While Peterson did contend that he was actually in custody before that time, the trial court's

---

**20.** *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628.

**21.** *Id.* at 444, 86 S.Ct. at 1612.

**22.** *Michigan v. Mosley*, 423 U.S. 96, 99–100, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Schade v. State*, 512 P.2d 907, 914 (Alaska 1973).

**23.** See note 1, *supra.*

**24.** See note 3, *supra.*

**25.** 384 U.S. at 444, 86 S.Ct. 1602.

decision rejected that view and the evidence adequately supports that decision.

■ Peterson argues alternatively that even assuming that he was not in custody until after the third interview, "the principle of *Miranda* . . . should be extended to cover interrogation in non-custodial circumstances after a police investigation has focused on the [subject]."[26] Peterson claims that by the time of the second interview, and clearly by the time of the third, the investigation had focused on him as the primary suspect, and he should have been advised of his rights at that time.

We note that Peterson did not make any incriminatory statements during the first two interviews. The record shows that Peterson received an adequate *Miranda* warning before the third interview.[27] Thus, even though Peterson was not in custody at the outset of the third interview, he did in fact receive an adequate *Miranda* warning before that interview. Therefore, we need not decide whether our state constitution extends to an accused any greater right to *Miranda* warnings than does the federal constitution.[28] We hold that Peterson was given adequate warnings at all points necessary.

Appellant argues further that he was incapable of knowingly and intelligently waiving his right to remain silent and his right to counsel because he did not understand the legal significance of those rights. This contention is based in part on Peterson's emotional state at the time of questioning and in part on Peterson's cultural background. The trial court rejected this argument and ruled that Peterson did understand his *Miranda* rights.

■ Appellant argues that Paul Peterson, a 24-year-old Aleut Native, born and raised in Chignik, Alaska, and with only third-grade reading skills, could not knowingly and intelligently waive his right to counsel. Appellant presented expert testimony that at the time of questioning Peterson understood that he did not have to answer questions, but that "he did not realize what the legal consequences of his choice to speak without counsel might be— did not realize that he had any rights worth securing." Recognizing that the State bears a heavy burden to demonstrate knowing and intelligent waiver when custodial statements are taken without counsel,[29] appellant asserts that the State has not met this burden and Peterson's statements should have been suppressed.

**26.** This sentence tracks the language used by the United States Supreme Court to characterize the issue presented in *Beckwith v. United States*, 425 U.S. 341, 345, 96 S.Ct. 1612, 1615, 48 L.Ed.2d 1 (1976). That court in turn was quoting with approval the characterization given the case by Chief Judge Bazelon at 166 U.S.App.D.C. 361, 510 F.2d 741, 742 (1975).

**27.** See note 1, *supra,* and accompanying text.

**28.** In *Beckwith v. United States*, 425 U.S. 341, 346, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976), the United States Supreme Court made clear that under the federal constitution, "it was the *custodial* nature of the interrogation which triggered the . . . specific requirements" of *Miranda.* (Emphasis in original) See also *Oregon v. Mathiason*, — U.S. —, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

The Court in *Beckwith* repeated the definition of "custodial interrogation" which it had used in *Miranda*:

questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. 425 U.S. at

345–46, n. 6, 96 S.Ct. at 1616, quoting *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. 1602 (footnote omitted).

However, the Court did recognize

that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where "the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined. . . ." When such a claim is raised, it is the duty of an appellate court, including this Court, "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." Proof that some kind of warnings were given or that none were given would be relevant evidence only on the issue of whether the questioning was in fact coercive. 425 U.S. at 347–348, 96 S.Ct. at 1617 (citations omitted).

**29.** *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. 1602; *Tarnef v. State*, 512 P.2d 923, 934 (Alaska 1973).

In *Gregory v. State*, 550 P.2d 374 (Alaska 1976), we held that Criminal Rule 39(b)(3) requires a magistrate, before accepting a plea from an unrepresented defendant, "by recorded colloquy . . . to ascertain whether [the defendant understands] the benefits of counsel. . . ."[30] We stated further that:

it must be clear from the record that the person has been informed of the role of a defense attorney and the advantages of being represented by one in a criminal proceeding. Only after this information is placed before the accused can it be said that he has the capacity, in a legal sense, to make a knowledgeable waiver of his right to counsel under Rule 39(b)(3).[31]

In *Gregory* this court was concerned that some defendants, because of their mental condition, age, education, experience, or the complexity of their cases, might be unable to intelligently decide whether they need assistance from counsel to enter their pleas; in such cases magistrates must assign counsel as a requisite of due process.[32]

▮ Appellant argues that law enforcement officers must conduct a *Gregory*-type inquiry of all suspects as a prerequisite to gaining admissible statements without counsel. We disagree. The decision in *Gregory* was based in part on the language of Criminal rule 39, which requires appointment of counsel for a defendant who appears for arraignment or trial without counsel "unless he demonstrates that he understands the benefits of counsel and knowingly waives same." Rule 39(b)(3) specifically requires the judge or magistrate presiding .at arraignment or trial to ascertain whether an unrepresented defendant understands the benefits of counsel, not just that he or she has a right to counsel. Law enforcement officers are not under any such specific mandate, and we decline to extend *Gregory* to interviews of criminal defendants by law enforcement officers.

▮ In reviewing communications between law enforcement officers and suspects, we will, however, consider the mental condition, age, education, and experience of the suspect,[33] and we encourage law enforcement officers to take those factors into account when communicating with suspects. We note that while Paul Peterson's predominant ties are to the Chignik Lagoon bush area, he did spend three of his seven years of school in Kodiak and he was stationed in Georgia for three years while in the Army. Peterson answered the questions of his interviewers responsively; all of his answers were sensible responses to the questions asked.[34] We conclude that the trial court's ruling that Peterson adequately understood his *Miranda* rights is supported by the evidence. Therefore, Peterson was not entitled to suppression of any of his five statements.

III. Did the trial court err in refusing to recognize the attempted peremptory challenge of Judge Moody?

Appellant argues that AS 22.20.022[35] provides a party and his attorney each with a

30. 550 P.2d at 379.

31. *Id.*

32. *Id.* at 380.

33. See text accompanying note 32, *supra.*

34. It is enlightening to compare Peterson's experiences with areas outside of the Alaska bush with the description of the defendant's experiences and lifestyle in *Gregory v. State*, 550 P.2d 374 (Alaska 1976). Note especially Gregory's difficulty with English, a difficulty not evidenced by Peterson, and the nonresponsiveness of Gregory's answers to the magistrate's questions.

35. AS 22.20.022 provides in pertinent part:

(a) If a party or his attorney in a district court action or a superior court action, civil or criminal, files an affidavit alleging under oath that he believes that he cannot obtain a fair and impartial trial, the presiding district court or superior court judge, respectively, shall at once, and without requiring proof, assign the action to another judge of the appropriate court in that district, or if there is none, the chief justice of the supreme court shall assign a judge for the hearing or trial of the action. The affidavit shall contain a statement that it is made in good faith and not for the purpose of delay.

. . . . .

(d) No party or his attorney may file more than one affidavit under this section in an action and no more than two affidavits in an action.

peremptory challenge, and to the extent that Criminal Rule 25(d) attempts to limit that substantive right to one challenge between the two of them, it is invalid.[36] The State maintains that AS 22.20.022 was intended to provide only one peremptory challenge per side, to be exercised by either the party or his attorney.

The original bill from which AS 22.20.022 evolved, Senate Bill 66 (February 6, 1967), provided only one peremptory challenge: a party who believed he could not obtain a fair trial was entitled to a challenge; either the party or his attorney could exercise the challenge. Senate Bill 66 was amended to allow challenge for bias against an attorney as well as for bias against a party. The amendment provided that a party *or his attorney* could file an affidavit alleging a good faith belief of bias against him. However, the attorney could no longer allege a good faith belief that the client would not receive a fair trial, but he could allege that *he* would not receive a fair trial. In this form, AS 22.20.022(a) was adopted.

The original bill also provided:

No party personally or through his attorney may file more than one affidavit under this section in an action.

With the amendment, that provision was changed to read:

No party or his attorney may file more than one affidavit under this section in an action.

With subsequent amendment by the House Judiciary Committee, AS 22.20.022(d) reached its final form:

No party or his attorney may file more than one affidavit under this section in

an action and no more than two affidavits in an action.

The House Judiciary Committee report on this amendment indicates that the amendment was designed to reduce the bill's cost to the judiciary.[37]

Appellant argues that AS 22.20.022(a),[38] which provides the challenge for party or attorney, confers two challenges per side unless the ambiguous subsection (d) limits this. Appellant asserts that the amendment to proposed AS 22.20.022(a) was designed to recognize that there are two types of bias which may affect an action: party bias and attorney bias. He submits that the legislature would not amend the bill to recognize this and then decide to give relief only from half of the possible bias in an action. Further, he asserts that the phrase "no more than two affidavits in an action" in AS 22.20.022(d) cannot stand alone, and that it must be meant to limit the attorney and the client to one affidavit each.

While appellant persuasively argues that the legislature's recognition of attorney bias is rendered somewhat less meaningful if in a given case only attorney bias *or* party bias can be escaped, the State offers a number of arguments which lead us to adopt its position and that of the trial court.[39] Under appellant's view, the addition by the House of the phrase "and no more than two affidavits in an action" would be meaningless because the existing version of subsection (d), which said "[n]o party or his attorney may file more than one affidavit . . . .," already made it clear that the attorney and the party could only file one affidavit each. In addition, only the Third Judicial District has more than four superior court judges. To have allowed two peremptory challenges per side

---

**36.** See *Gieffels v. State*, 552 P.2d 661, 665–669 (Alaska 1976).

**37.** 1967 House Journal 311, Judiciary Committee Report on Senate Bill No. 66 (amended and as further amended by the House Judiciary Committee).

**38.** See note 35, *supra.*

**39.** Mr. Hellen's affidavit in this case alleged that he believed that the *defendant* could not

obtain a fair trial from Judge Moody. This followed Paul Peterson's affidavit alleging that he believed that *he* could not obtain a fair trial from Judge Lewis. Thus both affidavits alleged party bias, even though the first amendment to Senate Bill 66 took away the attorney's right to assert bias against his client. On this basis alone, the peremptory challenge of Judge Moody was properly denied.

would have been quite costly to any other district and would have conflicted with the announced purpose of the House amendment: to reduce the bill's cost.[40] We conclude that the "no more than two affidavits in an action" phrase was added to limit peremptory challenges to two in total for any action.

■ We conclude further that Judge Moody properly denied the second peremptory challenge by the defense. Under Criminal Rule 25 and AS 22.20.022, the defense and the State are each entitled to only one peremptory challenge.

IV. Did the trial court err in refusing to dismiss the indictment against appellant because the grand jury which indicted him was improperly constituted?

■ Appellant asserts that the indictment against him should have been dismissed because the grand jury which indicted him was located in Anchorage rather than in Kodiak. Criminal Rule 6(b)(1)(v) provides that offenses committed within election district 12 under the 1965 reapportionment plan, which includes Chignik Lagoon, shall be investigated by a grand jury convened at Kodiak. Appellant argues that under Rule 6(b) an Anchorage-convened grand jury would not be properly constituted to return an indictment against him and that an indictment returned by an improperly constituted grand jury must be dismissed as invalid. In response the State points to an order signed by Presiding Judge C. J. Occhipinti on April 27, 1973, which provides that:

> in the interests of justice all Grand Jury sessions within the Third Judicial District will be convened at Anchorage, Alaska, and the grand jurors will be selected at large from the entire District.

The order goes on to provide that grand jury sessions will be held at Kodiak only when it shall appear to the Presiding Judge,

40. See note 37, *supra,* and accompanying text.

*inter alia,* that "the interests of justice so require."

The State argues that Judge Occhipinti's order was a proper exercise of the power conferred on him by Criminal Rules 6(b)(2) and 6(c), and therefore, the grand jury which returned the Peterson indictment was properly constituted. Rules 6(b)(2) and 6(c) provide:

> (b)(2) *Special Sites.* The presiding judge of a judicial district shall be empowered to call a special grand jury to be convened at a site other than the site designated in the preceding subsection, if the presiding judge determines that the designation of a special site is necessary in the interest of justice.

> (c) *Selection of Grand Jurors.* The jurors selected for service on a grand jury shall have the qualifications and shall be drawn and selected as set forth by law, with the additional provisions:

> (1) jurors who serve on the grand jury shall be selected from the population within a fifty-mile radius of the place where the grand jury is convened, and

> (2) the presiding judge of the superior court may with the approval of the administrative director select grand jurors at large from the judicial district in which the crime occurred.

Appellant maintains that Judge Occhipinti's order was invalid because it did not comply with Rule 6(b)(2). He argues that that provision was designed to empower the presiding judge to convene a special grand jury in addition to, and not in place of, the grand jury convened at the designated site under Rule 6(b)(1). Absent special factors of necessity, appellant maintains that the grand jury sites designated must be used.

Appellant has well-characterized the effect of this order: the order has reversed the presumption of local involvement. An Anchorage grand jury will be provided under the order unless special circumstances dictate a Kodiak grand jury. We hold that in issuing this order Judge Occhipinti exceeded the authority granted to him under Rule 6(b)(2).[41] His order was invalid, and

41. The State correctly notes that our decision in *Alvarado v. State*, 486 P.2d 891, 905 (Alaska 1971), approved the selection of petit jury pan-

the grand jury convened pursuant to it was improperly constituted. We must therefore decide whether the impropriety in the grand jury which indicted Peterson necessitated dismissal of the indictment against him. We conclude that it did not.

The concern behind appellant's challenge to Judge Occhipinti's order is the principle announced by this court in *Alvarado v. State*, 486 P.2d 891, 902–903 (Alaska 1971):

> Where . . . prospective jurors are selected from an area which does not encompass the scene of the alleged crime, there will always be a danger that significant elements of the community in which the crime occurred will be excluded from representation on the jury panel, and that the panel will consequently fail to represent a fair cross section of the community.

The *Alvarado* decision dealt with selection of petit jury panels. The challenge in this case is to the grand jury selection process. Appellant asks this court to extend the rationale of *Alvarado* to the case at bar. We decline to do so.

We are not here presented with allegations of systematic exclusion of one class of people from the grand juror selection process.[42] The allegation of error is a general one: that non-urban Native peoples were underrepresented in the grand jury pool because they are less present in the urban setting. Appellant did not systematically examine the actual makeup of the grand jury which returned the indictment herein.[43] We must thus base our decision on appellant's claim that prejudice is inherent in any grand jury which does not contain the same racial and cultural mix as that of the situs of the alleged crime.[44]

There are cultural differences between every urban and rural area in Alaska. No two communities share the same cultural or racial makeup. These differences are of substantial importance when a body of citizens is asked to determine the guilt or innocence of one charged with a crime. They are of less importance in the accusatorial process.[45] A grand jury is asked to determine only that a crime has been committed and that there is probable cause to believe that a particular person committed that crime. So long as no group of citizens has been systematically excluded from the grand jury selection process, a conviction on an indictment which is otherwise sufficient will be upheld.[46]

**42.** See *Crawford v. State*, 408 P.2d 1002, 1007 (Alaska 1965), citing *Eubanks v. Louisiana*, 356 U.S. 584, 585–589, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); *Reece v. Georgia*, 350 U.S. 85, 87, 76 S.Ct. 167, 100 L.Ed. 77 (1955); *Hernandez v. Texas*, 347 U.S. 475, 477–482, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

els from among residents of either the entire judicial district or the senate district in which a crime is alleged to have occurred. However, Criminal Rule 6 clearly dictates that selection of grand jurors for crimes alleged to have been committed within election district 12 shall presumptively be from among those who live within a 50-mile radius of Kodiak. It is irrelevant that we might have approved the two pools suggested in *Alvarado* for grand jury panels if such a case had been presented to us prior to the promulgation of Criminal Rule 6. The panel for grand jury selection provided in Rule 6 represents our considered judgment that the panel provided will effectuate the concerns of local involvement in the grand jury process. Judge Occhipinti's order circumventing Rule 6 is therefore clearly invalid.

**43.** See Note, "Supreme Court Declines to Consider Whether Due Process Requires Impartial

Grand Juries on Record Presenting Speculative Evidence of Bias," 111 U.Pa.L.Rev. 1000 (1963). Cf. *Beck v. Washington*, 369 U.S. 541, 546, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).

**44.** In *Crawford v. State*, 408 P.2d 1002, 1010 (Alaska 1965), this court stated that it would

> not require, in order to maintain the broad base that our jury system is designed to have, that there be equal representation on juries of every economic, social, religious, racial, political and geographical group . . . .."

**45.** On the differences between the accusatorial grand jury function and the trial process, see generally *Coleman v. State*, 553 P.2d 40, 47–52 (Alaska 1976), and *State v. Parks*, 437 P.2d 642, 645 (Alaska 1968). See also Note, "Supreme Court Declines to Consider Whether Due Process Requires Impartial Grand Juries on Record Presenting Speculative Evidence of Bias," 111 U.Pa.L.Rev. 1000, 1002–1004 (1963).

**46.** See *Crawford v. State*, 408 P.2d 1002, 1007–1010 (Alaska 1965). See also *Taggard v. State*, 500 P.2d 238, 243 (Alaska 1972), in which we

V. Did the trial court err in refusing to dismiss the indictment against appellant for lack of specificity?

 Appellant asserts that the indictment against him is void because it does not state a specific theory by which he is alleged to have committed the four murders. Therefore, he argues that the indictment does not serve as an indication that the grand jury in its deliberations did in fact consider each and every element of the crime before voting a true bill. Appellant asserts that without such an indication, he is denied the protection against malicious prosecution and arbitrary harassment which the grand jury is designed to provide.

The State notes correctly that appellant is relying on federal cases which are distinguishable. Records of federal grand jury proceedings are not available to a defend-

ant. Therefore, greater specificity in the indictment is needed to insure against indictment without consideration of all the elements of the crime. Under Criminal Rule 6(m), Alaska defendants can listen to recordings of and acquire transcripts of grand jury proceedings and can inspect exhibits presented to the grand jury. Thus a criminal defendant in Alaska can ascertain what evidence the grand jury had before it and can protect himself or herself against prosecution on a totally different theory than that presented to the grand jury. Therefore we reject the technical specificity argument advanced by appellant.

The judgment of the trial court is AFFIRMED.

---

stated that "[a] mere formal defect does not require dismissal of an indictment after the guilt of the defendant has been established at a fair trial." (Footnote omitted)