Harold C. DEPP, Appellant,

v.

STATE of Alaska, Appellee.

No. 7002.

Court of Appeals of Alaska.

July 27, 1984.

Susan Orlansky, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Jeffrey W. Cole, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Harold C. Depp was convicted by a jury of three counts of first-degree sexual assault and three counts of sexual abuse of a minor. Former AS 11.41.410(a)(3); former AS 11.41.440 and AS 11.41.455(a)(4). Superior Court Judge Ralph E. Moody sentenced Depp to concurrent sentences of fifteen years on the three sexual assault convictions and three years on the sexual abuse convictions; he suspended seven years of the sentence. On appeal, Depp argues that the grand jury which indicted him was improperly convened in Anchorage, that statements taken from him should have been suppressed because they were obtained in violation of the Alaska Code of Professional Responsibility, that a mistrial should have been granted because of discovery violations, and that his sentence was excessive.

■ We hold that the grand jury was improperly convened in Anchorage but that Depp has failed to show that the error requires dismissal of his indictment. We also find that suppression of statements taken from Depp was not required and that the alleged discovery violations by the state do not warrant reversal. Finally, we hold that Depp's sentence is not excessive.

At the time of these offenses, Depp was fifty-one years of age and the principal of Unalaska City School. During 1980 and 1981, Depp subjected C.H., the eleven-year-old son of one of Depp's friends in Unalaska, to repeated acts of sexual assault and abuse. At the time of Depp's offenses, Unalaska was in election district 12 in the Third Judicial District. Former Criminal Rule 6(b)(1)(v) required grand juries to be convened in Kodiak to consider offenses committed in election district 12. Pursuant to a standing order entered by Presiding Superior Court Judge Ralph E. Moody, however, an Anchorage grand jury indicted Depp in May of 1981. Prior to trial, Depp argued that dismissal of his indictment was required because his case was not presented to a Kodiak grand jury. Judge Moody denied Depp's motion, and Depp renews his argument on appeal.

In *Nicholson v. State*, 656 P.2d 1209 (Alaska App.1982), we considered the validity of Judge Moody's standing order and concluded that it violated former Criminal Rule 6(b)(1)(v). Our decision in *Nicholson* relied on the Alaska Supreme Court's decision in *Peterson v. State*, 562 P.2d 1350, 1365–66 (Alaska 1977). *Nicholson* and *Peterson* make it clear that presentation of Depp's indictment to an Anchorage grand jury was improper.

The error committed in presenting Depp's case to an Anchorage grand jury does not, however, automatically warrant dismissal of the indictment. In *Peterson v. State*, 562 P.2d at 1366, the supreme court held that dismissal of an indictment that had been presented to a grand jury at an improper location will be warranted only if the accused can demonstrate that a cognizable class of people was systematically excluded from the grand jury selection process. Depp argues that non-urban Alaskans—persons from outside the Anchorage area [1]—were systematically excluded from the grand jury that indicted him. We conclude that Depp has failed to demonstrate either systematic exclusion or the existence of a cognizable group.

Depp's showing of exclusion is restricted to a statistical analysis of the grand jury panel to which his case was presented. In *Nicholson v. State*, 656 P.2d at 1211, we noted that "merely showing that a cognizable group exists and that such a group is underrepresented on the grand jury which returned the indictment will not suffice." *See Peterson v. State*, 562 P.2d at 1366. Here, Depp asserts that approximately seven percent of all grand jurors initially summoned for his panel were from outside the Anchorage area. Of the seventy-one jurors actually reporting for grand jury duty,

---

1. According to Depp's definition, the Anchorage area includes Anchorage, the Elmendorf and Fort Richardson military bases, Eagle River, Palmer, Wasilla and Chugiak. Depp designates Girdwood, Homer, Indian, Kodiak, Skwentna, Talkeetna, and Valdez as non-urban areas.

five—also approximately seven percent—were from outside the Anchorage area. The only explicit showing of exclusion that Depp makes is that none of the five reporting non-urban jurors were included in the eighteen-person grand jury that heard his case. We do not believe that these figures, standing alone, reasonably support an inference that non-urban residents in the Anchorage area were systematically excluded from serving on Depp's grand jury.

Even if a systematic exclusion of non-urban residents had been established, the record would not support a conclusion that the excluded group was legally cognizable. In *Tugatuk v. State*, 626 P.2d 95, 100 n. 7 (Alaska 1981), the Alaska Supreme Court applied the following definition of a cognizable group, which was originally set forth in *United States v. Guzman*, 337 F.Supp. 140, 143–44 (S.D.N.Y.), *aff'd*, 468 F.2d 1245 (2d Cir.1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973):

> A group to be 'cognizable' for present purposes must have a definite composition. That is, there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of the juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace.

*See also Hampton v. State*, 569 P.2d 138, 148 (Alaska 1977) (applying same standard).

Depp's assertion that, in this case, non-urban Alaskans constituted a cognizable group falls short of meeting the three prongs of the *Tugatuk* standard. First, since residents of the Anchorage area can move freely to non-urban areas of the state, and non-urban dwellers can move to the Anchorage area, the group designated by Depp clearly has a shifting membership. Membership in the group is to a large extent arbitrary: communities such as Palmer and Girdwood are included in Depp's definition of the "urban area," while communities such as Homer and Talkeetna are excluded. Second, Depp has failed to show that non-urban Alaskans constitute a cohesive group. There is no evidence that members of this group have "a basic similarity in attitudes or ideas or experience" that is not adequately represented by Anchorage area residents. Finally, Depp has failed to establish any realistic possibility that Anchorage area residents are biased toward non-urban residents. *See Peterson v. State*, 562 P.2d at 1366.

Depp argues, alternatively, that we should dismiss his indictment even if we conclude that he has failed to demonstrate the systematic exclusion of a cognizable group. Depp maintains that dismissal is necessary to assure future compliance by the superior court with Criminal Rule 6. However, to adopt a rule of automatic dismissal would be inconsistent with our holding in *Nicholson v. State*, 656 P.2d at 1211,[2] and with the supreme court's holding in *Peterson v. State*, 562 P.2d at 1366. Moreover, Depp's argument ignores the supreme court's recent amendment of Criminal Rule 6. The amended rule permits offenses committed in Unalaska to be heard by grand juries convened in Anchorage.[3] Thus, if we were to dismiss Depp's

---

**2.** Depp's grand jury was convened prior to issuance of our decision in *Nicholson*.

**3.** Alaska.R.Crim.P. 6(b)(1)(vii), as amended by Supreme Court Order 539 effective October 1, 1982, now provides:

> (b) *Where Grand Juries Shall Be Convened.* In order to investigate crimes, the grand jury

indictment based on the violation of former Criminal Rule 6, he now could apparently be reindicted in Anchorage. Under these circumstances, the error in presenting Depp's case to the Anchorage grand jury is harmless. *Love v. State*, 457 P.2d 622, 630–32 (Alaska 1969).

Depp next contends that the trial court should have suppressed statements that he made to police prior to his indictment. After Depp's offenses were first reported, Officer Royal Nelson of the Unalaska Department of Public Safety contacted Depp at Depp's office. He informed Depp of his *Miranda* rights. While Nelsen was in Depp's office, Depp received a telephone call. Depp told Nelsen that the call was from his attorney, who had advised him not to speak with the police. However, Depp said that he wanted to disregard his attorney's advice and talk to Nelsen about the offense. Nelsen urged him to heed the advice of his attorney. Depp nevertheless insisted on speaking with Nelsen, and Nelsen proceeded to interview Depp. Later that day, Nelsen continued the interview at Depp's home.

Two days later, Nelsen contacted Depp at his home and asked if he would consent to an interview with an assistant district attorney. Depp consented. Assistant District Attorney Paul Olson, who was in Unalaska for a trial, came to Depp's home with Nelsen during the noon hour. When Olson learned that Depp was represented by an attorney, he advised Depp of his *Miranda* rights and advised him to heed the advice of his attorney. However, Depp again indicated that he was willing to discuss the offense against his attorney's advice. In the ensuing conversation, neither Depp nor Olson discussed the details of the offense; for the most part, Olson advised Depp of procedural matters, such as arraignment and bail, that were likely to be involved in the case after Depp was formally charged. After Olson left Depp's home, Nelsen again interviewed Depp. At the beginning of this interview, Nelsen again informed Depp of his *Miranda* rights. Depp told Nelsen that he "wanted to get this situation over with." He proceeded to give Nelsen a statement concerning the offense; Nelsen tape recorded this interview.

Prior to trial, Depp moved to suppress the oral and taped statements taken by Nelsen and Olson. Depp argued that the statements were involuntary and had been taken in violation of his constitutional rights to counsel and against self-incrimination. As part of his constitutional claim, Depp argued that when Nelsen and Olson interviewed him, they knew that he had contacted an attorney and that he had not had an adequate opportunity to confer with his attorney. After a hearing, Judge Moody denied Depp's suppression motions, finding that Depp had knowingly waived his right to counsel and his right to remain silent and that Depp's statements had been voluntary.

On appeal, Depp has abandoned his constitutional claims. He does not contest the trial court's finding that his statements were voluntary and its conclusion that no constitutional violation occurred. Depp's argument is now narrowly focused on the claim that his statements should have been suppressed because they were obtained in violation of the Code of Professional Responsibility. The state contends that Depp waived his right to assert this argument by failing to raise it below. We conclude, however, that the merits of Depp's argument on appeal should be considered because the argument is closely related to the claim Depp asserted below concerning violation of his right to counsel.

Depp asserts that Nelsen and Olson violated Disciplinary Rule (DR) 7–104 of the Code of Professional Responsibility because they interviewed him without first informing his attorney. DR 7–104, entitled *Communicating with One of Adverse Interest*, provides in part:

shall be convened at a place which shall be determined as follows:
  (1) Designated Sites.
    . . . .

(vii) If the offense was committed within election districts 7, 8, 9, 10, 11, 12, 13, 14, or 15, then the grand jury shall be convened at Anchorage, Alaska.

(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

DR 1–102, entitled *Misconduct,* is also relevant, and provides, in part:

(A) A lawyer shall not:

. . . .

(2) circumvent a disciplinary rule through actions of another.

Even though Depp acknowledges that Nelsen is not a lawyer and is not personally bound by DR 7–104, he contends that the statements Nelsen obtained from Depp could not have been introduced at trial without violating DR 1–102(A)(2).

There is widespread disagreement in the caselaw concerning the appropriate judicial response to violations of DR 7–104(A)(1). *See generally* Leubsdorf, *Communicating with Another Lawyer's Client: The Lawyer's Veto and the Client's Interests,* 127 U.Pa.L.Rev. 683 (1979). Depp urges us to adopt the rule set forth in *United States v. Thomas,* 474 F.2d 110 (10th Cir.), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973). Thomas was in pretrial custody on federal drug charges and, after his attorney unsuccessfully sought a reduction in bail, he contacted a government investigator. The investigator interviewed Thomas in prison at Thomas's request. He was apparently unaware that Thomas was represented by counsel. Prior to the interview, Thomas signed a waiver of his *Miranda* rights. Thereafter, he gave the investigator a written statement. This statement was used by the government during cross-examination of Thomas at trial. On appeal, the Federal Court of Appeals for the Tenth Circuit held that the government's use of Thomas's statement constituted a breach of DR 7–104. The court stated:

[O]nce a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present. To hold otherwise, we think, would be to overlook conduct which violated both the letter and spirit of the canons of ethics. This is obviously not something which the defendant alone can waive.

*Thomas,* 474 F.2d at 112. However, the court in *Thomas* refused to reverse the conviction. The court held that the rule it had announced should be applied only in future cases. *Id.*

This court has considered the *Thomas* rule, without adopting it, on two prior occasions. *See Balthazor v. State,* 653 P.2d 662, 663–64 (Alaska App.1982); *Loveless v. State,* 634 P.2d 941, 946 n. 11 (Alaska App. 1981). The decisions of other jurisdictions also indicate an unwillingness to follow the approach taken by *Thomas.* Some courts have concluded that, absent a claim of constitutional error, a disciplinary violation does not justify suppression of evidence. *State v. Morgan,* 231 Kan. 472, 646 P.2d 1064, 1069–70 (1982); *People v. Green,* 405 Mich. 273, 274 N.W.2d 448 (1979). Other courts have held that when a defendant who is represented by counsel is interviewed without his counsel present, his statements may be admissible if he expressly waives his right to counsel or if a waiver of the right to counsel can be inferred. *People v. Pierson,* 670 P.2d 770 (Colo.1983); *Giddings v. State,* 290 N.W.2d 595 (Minn.1980).

The Ninth Circuit Court of Appeals has held that suppression will be warranted only in cases where custodial interrogation of a represented defendant occurs without an express waiver of counsel. *Coughlan v. United States,* 391 F.2d 371 (9th Cir.), *cert. denied,* 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968). The Fifth Circuit has held that when a defendant who is represented by counsel is in custody, any inter-

rogation in the absence of his counsel is improper, but that reversal will not be required where a clear waiver of counsel is found. *Wilson v. United States*, 398 F.2d 331, 333 (5th Cir.1968), *cert. denied*, 393 U.S. 1069, 89 S.Ct. 727, 21 L.Ed.2d 712 (1969). The Third Circuit has held that suppression of evidence for violation of DR 7–104 is specifically precluded because of a federal statute requiring admission of statements that are voluntarily made. *United States v. Crook*, 502 F.2d 1378 (3rd Cir.1974). The New York Court of Appeals has adopted a rule, based on its state constitution, that requires suppression only if a represented defendant is interrogated by police in the absence of his counsel after being taken into custody. *People v. Hobson*, 39 N.Y.2d 479, 348 N.E.2d 894, 898, 348 N.E.2d 894 (1976). In sum, although courts have not condoned disciplinary rule violations, there has not been widespread adoption of an exclusionary rule based solely on violations of the disciplinary rule.

In this case, Depp acknowledges that only a few courts have actually applied sanctions for violation of DR 7–104 by government prosecutors or investigators. *See, e.g., United States v. Batchelor*, 484 F.Supp. 812 (E.D.Pa.1980). Depp nevertheless argues that the holding of the court in *United States v. Thomas* justifies suppression of the evidence in this case. Yet this argument overlooks the narrow scope of the *Thomas* holding. In concluding that its holding should be applied only prospectively, the court in *Thomas* stated:

> A violation of the canon of ethics as here concerned need not be remedied by a reversal of the case wherein it is violated. This does not necessarily present a constitutional question, but this is an ethical and administrative one relating to attorneys practicing before the United States courts.

474 F.2d at 112. Thus, it is apparent that the rule of suppression adopted in *Thomas* was narrowly premised on the court's supervisory authority over "ethical and administrative" matters relating to attorneys.

Depp has cited no cases, and we are aware of none, in which a court has even suggested that suppression would be appropriate in a case such as the present one. Here, Depp made no incriminating statements of any significance to the prosecutor with whom he spoke. The incriminating statements made by Depp occurred during interviews with Officer Nelsen. There is no evidence that Nelsen acted at the request of the prosecution, and Nelsen's interviews clearly occurred at the investigative stage of the case, prior to any formal action against Depp. Moreover, there can be little doubt concerning the voluntariness of Depp's statements. Although the statements appear to have been the product of police interrogation, that interrogation was clearly non-custodial. Depp had never been arrested in connection with these charges, and there was nothing coercive about the manner in which he was interviewed by Nelsen. Depp was repeatedly informed of his *Miranda* rights and was repeatedly cautioned to heed the advice of his attorney. He nevertheless insisted on continuing with the interviews.

These circumstances, we believe, raise a substantial question whether use of Depp's statements should properly be deemed to violate the disciplinary rules. Although Nelsen was aware that Depp was represented by counsel, it is not clear that the disciplinary rules directly apply to Nelsen, since he was not an attorney and his contacts with Depp occurred at the investigative stages of the case and were apparently not instigated or encouraged by Olson. Furthermore, it is not clear that the prosecution's subsequent use of statements Depp made to Nelsen constituted an attempt by the state to "circumvent a disciplinary rule through actions of another." DR 1–102(A)(2).

Under these circumstances, we do not think it is necessary to decide whether violations of DR 7–104(A)(1) and DR 1–102(A)(2) by the prosecution should generally result in the suppression of evidence in a criminal case. Nor are we required to decide whether suppression, if warranted, would apply to non-custodial contacts with

a represented defendant or to interrogations conducted after an express waiver of the right to counsel by the defendant. We are convinced that, under the narrow facts of this case, suppression is not warranted, even assuming that the prosecution's use of Depp's statements amounted to a violation of the disciplinary rules. We conclude that any disciplinary rule violation in this case was so attenuated that the substantial interest in admitting reliable evidence resulting from police investigation substantially outweighs the marginal purpose that would be served by excluding Depp's statements. *See, e.g., Harker v. State,* 663 P.2d 932, 935 (Alaska 1983); *Elson v. State,* 659 P.2d 1195, 1202 (Alaska 1983); *State v. Sundberg,* 611 P.2d 44, 52 (Alaska 1980); *State v. Sears,* 553 P.2d 907, 912 (Alaska 1976).

Depp next contends that his conviction should be reversed because numerous discovery violations occurred during the trial. All of the alleged violations occurred during the testimony of D.H., the mother of one of the victims, C.H. Consideration of each of the alleged violations convinces us that any error was harmless.

■ Depp argues that D.H. testified to various statements made to her by Depp that were not disclosed to the defense in pretrial discovery. D.H. testified that C.H. had once been injured and was taken to an Anchorage hospital for x-rays. She stated that she and Depp accompanied C.H. to the hospital and that, when they had difficulty obtaining attention for C.H., Depp told hospital personnel that he was a doctor and that he had contacted the hospital earlier about C.H.'s injuries. When Depp objected to this testimony and moved for a mistrial, the prosecutor stated that he had first learned of the statement on the previous night, when he was interviewing D.H. in preparation for her testimony. The prosecutor conceded that he had not disclosed the statement to the defense. Judge Moody promptly ordered the jury to disregard the testimony; he denied Depp's motion for mistrial. Given the slight prejudicial effect of this testimony, as well as the

court's specific instruction to disregard it, we conclude that Judge Moody did not abuse his discretion in denying Depp's motion for mistrial.

■ Depp also points out that D.H. was permitted to give testimony concerning a motorcycle that Depp told police he wanted to leave in Unalaska for C.H. and his brother to use. Depp's statement to D.H. about the motorcycle was not disclosed to the defense in pretrial discovery. While we believe that a summary of the statement should have been furnished to Depp's attorney prior to trial, the potential prejudice from failure to disclose it was minimal. At most, the statement tended to show that Depp had been friendly toward the victim, a fact that Depp's counsel expressly acknowledged in his opening statement.

■ Depp also contends that D.H. was permitted to testify about a series of previously undisclosed statements Depp made to her about his family in California. D.H. testified that on a number of occasions Depp talked to her about the death of his son and his wife and stated that C.H.'s dark hair reminded him of his own son. A number of questions asked by the prosecutor on this topic implied that Depp's statements concerning his family had been false. After considering argument, Judge Moody ruled that discovery materials made available to the defense by the prosecution prior to trial, which included letters to D.H. purportedly written by Depp's son in California, adequately placed Depp on notice that, at trial, the prosecution might inquire into conversations D.H. had had with Depp about his family. Depp contends that Judge Moody's ruling was in error because the prosecution had represented, prior to trial, that the letters to D.H. would not be introduced at trial. A review of the record does not support this contention. Prior to trial, Depp sought a protective order to prevent admission of the letters. At an omnibus hearing on the motion, the prosecutor stated that he was not planning to introduce the letters in his case-in-chief. However, Judge Moody specifically ruled that it would be premature to make a pre-

trial determination of admissibility. We note that, at trial, the prosecution did not seek to introduce any evidence showing that Depp had lied to D.H. about his family. The letters from Depp's son were not admitted into evidence or discussed in D.H.'s testimony. We conclude that Judge Moody did not commit error in ruling that Depp was adequately placed on notice that the state might question D.H. about statements made by Depp concerning his family.

■ Depp next contends that D.H. was improperly allowed to testify about previously undisclosed statements that her son made to her concerning sexual acts between him and Depp. Prior to trial, the prosecution had provided Depp with summaries of statements that D.H. had given to the police. These summaries, however, were considerably less detailed than D.H.'s trial testimony and did not disclose that C.H. had told D.H. about specific acts of sexual penetration by Depp. At trial, Depp objected and moved for a mistrial on this ground. Depp now claims that the lack of detail in D.H.'s interview summaries was particularly prejudicial because Depp's trial counsel, in reliance on the interview summaries, represented to the jury in his opening statement that no evidence would be presented by the prosecution to substantiate charges that Depp sexually penetrated C.H. We have reviewed relevant portions of the police reports provided to the defense prior to trial, as well as C.H.'s grand jury testimony, which was also available to Depp. We conclude that these materials were sufficient to place Depp on notice of the likelihood that both C.H. and his mother, D.H., might testify about specific acts of sexual penetration by Depp. We conclude that Judge Moody did not abuse his discretion in denying Depp's motion for mistrial based on D.H.'s testimony. We also conclude that Judge Moody properly denied Depp's alternative request for a lengthy continuance in order to allow his counsel to conduct an extensive investigation of D.H.'s background and credibility.

Viewing the alleged discovery violations as a whole, we further find that the state is correct in asserting that any error was harmless. The evidence against Depp at trial was overwhelming. In addition to D.H.'s testimony, C.H. described specific acts of sexual penetration and contact that he had been subjected to by Depp. Depp did not cross-examine C.H. or otherwise attempt to impeach his testimony. Much of C.H.'s testimony was corroborated by another child from Unalaska, T.V. Officer Nelsen testified at length concerning admissions made by Depp, and specifically informed the jury that Depp had confessed to having oral sex and intercourse with C.H. The defense called only one witness, who did not contradict the prosecution's evidence. We conclude that the alleged discovery violations by the state do not warrant reversal.

Depp's final contention is that his sentence for three counts of first-degree sexual assault is excessive. Judge Moody sentenced Depp to concurrent fifteen-year terms of imprisonment with seven years suspended on each count. Depp stresses that he was a first offender, that he has a good work history and a professional background, and that he has displayed considerable remorse concerning his offense. Depp also emphasizes his potential for rehabilitation and the apparent lack of physical and psychological harm to the victim.

Judge Moody, in sentencing Depp, commented that:

I don't think the court can overlook the fact that you've been dealing with young people through all these years. And you knew you had this problem.... and you as principal get yourself involved in this. There's no excuse for it. Not only that, but you planned this. You lied to people. You got the confidence of people—the parents, the children.... I just can't think of anything [that] more effects society than what you've done in the capacity which you held.... I have to consider this one of the most serious and aggravated offenses of this nature.

■ We believe that Judge Moody's emphasis on the reaffirmation of societal norms was not clearly mistaken. The need

to emphasize community condemnation of the offense will normally justify imposition of a significant period of incarceration for cases involving first-degree sexual assault. *See Mallott v. State*, 608 P.2d 737, 752 (Alaska 1980). As the Alaska Supreme Court explained in *Smothers v. State*, 579 P.2d 1062, 1064–65 n. 7 (Alaska 1978):

> Even though in an individual case, rehabilitation of the wrongdoer would require no punishment other than his personal remorse and nothing would be required to deter him or others from like conduct, preserving societal norms may necessitate an appropriate sentence.

■ However, we have also held that a first offender should normally receive a more favorable sentence than the presumptive sentence for a second offender, unless the case is an exceptional one. *Austin v. State*, 627 P.2d 657, 658 (Alaska App.1981). In the present case, Depp would have been subject to a presumptive sentence of six years if he had used a firearm in the commission of his offense or caused serious physical injury. The concurrent fifteen-year sentences with seven years suspended that Depp actually received exceed the presumptive term. Thus, the sentences are justified only if Depp's conduct can be considered to be substantially aggravated. *See State v. Brinkley*, 681 P.2d 351 (Alaska App.1984); *Peetook v. State*, 655 P.2d 1308 (Alaska App.1982). We believe that sufficient aggravating circumstances exist.

We note initially that Depp's concurrent sentences of fifteen years with seven suspended were imposed for three separate instances of first-degree sexual assault. At the time of his offenses, first-degree sexual assault was a class A felony, punishable by a maximum of twenty years' imprisonment. Depp was also convicted of three counts of sexual abuse of a minor, class C felonies punishable by a maximum term of five years' imprisonment. Judge Moody imposed these sentences concurrently as well. Thus, the appropriateness of Depp's total sentence must be assessed in light of the fact that it represents punishment for six separate felony convictions.

*Waters v. State*, 483 P.2d 199, 201–02 (Alaska 1971).

The offenses occurred over a protracted period of time. Repeated acts of less serious sexual abuse were committed by Depp during this period of time. The acts involved not only C.H., but also several other Unalaska children. At all times, Depp knew or reasonably should have known that his victims were particularly vulnerable and incapable of resistance because of their youth. *See* AS 12.55.155(c)(5). In addition, Depp admitted that, prior to this offense, he had had sexual contact with another child over a period of several years. Finally, we have previously noted the seriousness of the breach of trust that occurs when an educator becomes involved in sexual abuse of his students. In such cases, the need to reaffirm community norms and deter others from similar breaches is particularly high. *Goulden v. State*, 656 P.2d 1218, 1221–22 (Alaska App. 1983). Having independently reviewed the sentencing record, we conclude that Depp's sexual assault sentences were not clearly mistaken. *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

The convictions and sentences are AFFIRMED.